## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **GERALD W. EILAND (1),** ) | |
| **FREDERICK A. MILLER (2),** ) | **Criminal No. 04-379 (RCL)** |
| **ALVIN GASKINS (6),** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

## I. INTRODUCTION

This matter comes before the Court on the post-trial motions of three defendants in the second trial group: Gerald W. Eiland ("Eiland"), Frederick A. "Toby" Miller ("Miller"), and Alvin Gaskins ("Gaskins"). Following a lengthy trial and 14-day jury deliberation, the jury reached a unanimous guilty verdict as to each of the three above-named defendants.[1] Defendant Eiland was found guilty of Narcotics Conspiracy, RICO Conspiracy, Continuing Criminal Enterprise, attempted possession with intent to distribute heroin, and three counts of unlawful use of a communication facility. Defendant Miller was found guilty of Narcotics Conspiracy, RICO Conspiracy, Continuing Criminal Enterprise, attempted possession with intent to distribute heroin, and three counts of unlawful use of a communication facility. Defendant Gaskins was found guilty of Narcotics Conspiracy.

After trial, defendants each moved the Court within seven days for an extension of time

---

[1] Robert Bryant was also named as a defendants in the second trial group. The jury acquitted him of all charges.

1

to file post-trial motions.  The Court granted each defendant a thirty day extension within which to file their respective post-trial motions.  The defendants each timely filed motions seeking a judgment of acquittal, or in the alternative, a new trial.  Defendant Eiland filed on January 1, 2007 his Motion [910] for a Post-Trial Judgment of Acquittal or Alternatively for a New Trial. Defendant Miller filed on January 5, 2007 his Motion [911] for Judgment of Acquittal and/or Request for a New Trial.  Defendant Gaskins filed on December 31, 2006 his Motion [909] for Judgment of Acquittal and Alternate Motion for a New Trial.

Upon a thorough review of each party's filings, the applicable law, and the entire record herein, this Court has determined that all of the defendants' motions [909, 910, 911] for acquittal or for a new trial shall be DENIED.

## II.  DISCUSSION

I.    *Legal Standard*

  A.    *Motion for Acquittal*

A motion for acquittal filed after the jury has returned a guilty verdict asks the Court to set aside the verdict and enter a judgment of acquittal.  FED. R. CRIM. P. 29.  In reviewing a motion for judgment of acquittal, the Court must view all evidence in the light most favorable to the Government, giving it the benefit of all reasonable inferences.  *See United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983); *see also United States v. Fennell*, 53 F.3d 1296, 1298 (D.C. Cir. 1995) (providing for the deferential review of jury verdicts); *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990) (noting that "a jury is entitled to draw a vast range of reasonable inferences from evidence").  Accordingly, motions for judgment of acquittal are granted on the basis of insufficient evidence only if the court concludes, as a matter of law, that

no reasonable juror could have convicted the defendant based on the evidence presented. *See United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983) ("[A] judgment of acquittal is appropriate only when there is no evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt.") (citing *United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977)).

   B.   *Motion for New Trial*

   Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Generally, any such motion must be filed within seven days of the verdict unless otherwise specified by the Court. FED. R. CRIM. P. 33(b)(2).

   The decision of whether to grant a motion for a new trial is "committed to the sound discretion of the trial judge." *Reese*, 561 F.2d at 902. Such a decision is subject to reversal "only for abuse of discretion or misapplication of the law." *Id.* The defendant bears the burden of showing that a new trial would be in the "interest of justice." *Id.* Furthermore, even if the defendant demonstrates that an error occurred, a new trial is not warranted unless the defendant shows that the error influenced the jury to such a degree that a substantial right of the defendant was affected. *See* FED. R. CRIM. P. 52(a) (describing harmless error provision that "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded"); *Kotteakos v. United States*, 328 U.S. 750, 757 (1946) (noting that the harmless error provision restates existing law that technical errors, defects, or exceptions that do not affect the substantial rights of the parties are not grounds for reversal).

   Having carefully considered defendants' arguments, this Court finds that defendants fail

3

to carry their burden under either standard and accordingly are entitled to neither judgments of acquittal nor new trials.  None of the defendants has successfully demonstrated that any errors occurred; even if errors had occurred, defendants failed to show that the errors affected any substantial right of the defendants.  Each motion will be discussed separately.

II.      *Defendant Gerald Eiland's Motion* [909] *for Acquittal or Alternatively for a New Trial*

In his motion, defendant Eiland argues that his conviction of participation in a single conspiracy was insufficiently supported by the evidence, and that a "fatal variance" existed between the evidence shown at trial and the indictment.  (Eiland Mot. [910] 1-2.)  Specifically, defendant Eiland contends that the evidence introduced by federal prosecutors at trial showed that defendant Eiland participated in multiple independent conspiracies, as opposed to a single overarching conspiracy, as alleged within the indictment.  (*Id.*)  Further, defendant Eiland maintains that he was substantially prejudiced by this variance, on the grounds that the "transference of guilt that necessarily followed by the government's ability to introduce evidence from the various multiple conspiracies that would have been inadmissible as mere propensity evidence and not validly admissible under any valid FRE 404(b) theory."  (*Id.* at 4.)

The government counters that no such variance exists in this case.  The government argues instead that the evidence clearly establishes that the drug conspiracy at issue in this case was a classic "chain conspiracy," in which each conspirator performed particular interdependent roles in furthering the conspiracy and its goals.  (*See* Gov.'s Opp. Mot. [956] 9.)

Under the law of this Circuit, "[a] variance between the allegations of the indictment and the proof at trial constitutes grounds for reversal only if the [defendant] proves (1) that the evidence at trial established facts materially variant from those alleged in the indictment, and (2)

that the variance caused substantial prejudice." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988) (internal citations omitted). Within the context of a conspiracy prosecution, the defendant bears the burden of proving two elements: "(1) that the evidence established the existence of multiple conspiracies, rather than the one conspiracy alleged in the indictment, and (2) that because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *Id.* (internal citation omitted). A defendant must prove both elements in order to be entitled to relief.[2] For the following reasons, the Court finds that defendant Eiland has not proven either element in this case.

A.      *Sufficiency of Evidence of a Single Narcotics Chain Conspiracy*

In order to determine whether the evidence at trial established a single chain conspiracy or multiple independent conspiracies, the Court must consider a variety of factors. First, and most important, is "whether the conspirators share a common goal, such as the possession and distribution of narcotics for profit." *Tarantino*, 846 F.2d at 1393 (internal citations omitted). Second, the Court must consider the degree of dependence among the co-conspirators.[3] *Id.* (internal citations omitted). Third, and least significant, is whether there exists any "overlap of

---

[2] As the D.C. Circuit has found, a verdict for a single conspiracy "must be upheld if the evidence adequately supports a finding that a single conspiracy existed." *Tarantino*, 846 F.2d at 1391; *see also United States v. Gaviria*, 116 F.3d 1498, 1516 (D.C. Cir. 1997) (denying defendant's challenge to conviction for conspiracy on grounds that a variance existed "because the evidence demonstrates that [defendant] did participate in the charged conspiracy"). Moreover, a deficiency in proof of a single conspiracy is not fatal to the government if such a deficiency does not substantially harm the defendant. *See United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006).

[3] Inherent in this element is the notion of whether the evidence supports an inference that the conspirators knew of their link to other co-conspirators. *Tarantino*, 846 F.2d at 1393.

participants in the various operations claimed to comprise a single conspiracy." *Id.* 1393 (internal citation omitted).   When considering each of these factors, the Court must also be mindful of the longstanding precedent that "participants in a continuous drug distribution enterprise can be parties to a single conspiracy even if they do not all know one another, so long as [the evidence shows that] each knows that his own role in the distribution of drugs and the benefits he derives from his participation depend on the activities of the others." *United States v. Childress*, 58 F.3d 693, 709–10 (D.C. Cir. 1995).   Upon consideration of the evidence presented at trial against defendant Eiland, the government has more than ably established that a single conspiracy existed, and that defendant Eiland was an integral participant of this overarching conspiracy.

### 1.    *Evidence Shows Conspirators Shared A Common Goal*

First, the evidence shows that the conspirators shared a common goal of distributing mass quantities of drugs for profit in the Washington, D.C. area.   As joint heads of the conspiracy, defendants Eiland and Miller gained nearly $20,000 each week from the sale of drugs.   (Trial Tr., 44, Oct. 19, 2006, p.m.)   Darius Ames, a participant in the conspiracy, testified that, on one occasion, he used a money-counting machine to help Eiland count almost $800,000 in money located in a stash house used by Eiland, Miller and Ames.   (Trial Tr., 47-48, Oct. 4, 2006, p.m.)   Ames also testified that, on another occasion, he delivered a shoe box containing $90,000 from defendant Miller to defendant Eiland.   (*Id.* at 58.)   Further, defendants Eiland and Miller used much of this revenue obtained from their narcotics activity in order to purchase an additional supply of drugs and to pay other members of the conspiracy.   (Trial Tr., 74-75, Oct. 10, 2006, p.m.)

In addition to defendants Eiland and Miller, other members of the conspiracy profited from the sale of drugs that were sold by the enterprise.  For example, Timothy Thomas combined his money with money from defendant Eiland in order to purchase five kilograms of cocaine in Phoenix, Arizona, worth $50,000.[4]  (Trial Tr., 74-76, Oct. 10, 2006.)  As his consensual phone calls with Tyrone Thomas indicate, defendant Timothy Thomas stated that he hoped this investment in cocaine would yield an additional $50,000 in personal profit once the cocaine was sold on the street in the Washington, D.C. area.  (Consensual Phone Calls T-40, T-44.) Additionally, defendant Miller offered to pay Tyrone Thomas to transport by Lincoln Town Car the $50,000 in cash belonging to defendants Timothy Thomas and Eiland to Phoenix, Arizona, and to return to Washington, D.C. with the five kilograms of cocaine to be purchased by defendant Eiland.[5]  (Trial Tr., 72-76, Oct. 10, 2006, p.m.)  Moreover, both Darius Ames and James Ingram were paid between $4,000 and $6,000 to fly with defendant Eiland to Phoenix, Arizona, so that they might smuggle heroin back into the Washington, D.C. area.  (Trial Tr., 59, Oct. 4, 2006, p.m.)

In addition to his services in smuggling heroin from Phoenix, Arizona to Washington, D.C., Darius Ames was paid between $500 and $1000 each week for processing the smuggled raw heroin into street-level heroin.  (*Id.* at 26-31.)  As a lieutenant, Ricky Gore earned between $8,000 and $10,000 a week delivering drugs from defendant Eiland to street-level dealers, and returning the money from the street-level dealers to defendant Eiland.  (Trial Tr., 28, 32, 37, 43,

---

[4]  The government presented evidence at trial showing that the overarching conspiracy involved an attempt to purchase five kilograms of cocaine from Phoenix, Arizona, for purposes of smuggling it back to Washington, DC, for distribution.  At the time of Tyrone Thomas's arrest, four kilograms of cocaine were found in the trunk of his car and seized.

[5] *See supra* note 4.

Oct. 19, 2006, p.m.)  Charles Brown, another participant in the conspiracy, was paid by

defendant Miller to accept a package of drugs delivered to Brown's residence.  (Trial Tr., 32, Oct.

18, 2006.)  Finally, Brian Lipscombe, a hired hitman for the enterprise, was paid $10,000 in cash

and was given a white Acura Legend in exchange for agreeing to murder Sorenson Oruchie, a

former drug supplier to the enterprise.  (Trial Tr., 35-36, Oct. 26, 2006.)

> 2.    *Evidence Shows Interdependence*

Second, in a chain conspiracy, the success of the common objective of the conspiracy

depends upon the successful operation of each link in the chain conspiracy.  *See Childress*, 58

F.3d at 709-10 ("participants in a continuous drug distribution enterprise can be parties to a

single conspiracy even if they do not all know one another, so long as each knows that his own

role in the distribution of drugs and the benefits he derives from his participation depends on the

activities of the others."); *cf. Tarantino*, 846 F.2d at 1393 ("The existence of such a vertically

integrated, loose-knit combination may raise the inference that each conspirator has agreed with

the others (some whose specific identity may be unknown) to further a common unlawful

objective, e.g., the distribution of narcotics.").  "An individual associating himself with a 'chain'

conspiracy knows that it has a 'scope' and that for its success it requires an organization wider

than may be disclosed by his personal participation."  *United States v. Agueci*, 310 F.2d 817, 827

(2d Cir. 1962), *cert. denied*, 372 U.S. 959 (1963).

In this case, the evidence clearly shows that there was interdependence among the

individual participants from each link of the drug conspiracy.  Members of the conspiracy,

including defendants Eiland and Miller, traveled outside the Washington, D.C. area to negotiate

the purchase of wholesale narcotics.  The individuals who purchased the wholesale drugs were

obviously important to the conspiracy because, without the purchased wholesale narcotics, there would be no drugs to sell in the Washington, D.C. area at all.

Certain members of the conspiracy[6] then smuggled the purchased wholesale narcotics–in this case, cocaine and heroin—into the Washington, D.C. area.  The raw narcotics needed to be smuggled into the Washington, D.C. area because they did not originate there.[7]  Accordingly, the individuals in the smuggling arm of the conspiracy were important to the success of the enterprise because, without them, the common goal of making profit by selling drugs in the Washington, D.C. area could not be realized.

Once the raw drugs were smuggled into the Washington, D.C. area, they were then given to other conspirators—Darius Ames and Eric Butcher—who processed and packaged the drugs to prepare them for street-level distribution and consumption.  As Detective Washington testified, heroin can be extremely lethal in its raw state; even more so than heroin already is in its "cut"—or diluted—state.  (*Id.*)  Processing heroin using cutting agents helps make it more suitable for personal consumption.  Processing heroin also helps promote the conspiracy's goal of maximizing the profit it seeks because cutting increases the volume of the heroin that can be sold.  (*Id.*)  Cocaine base, more commonly known as crack cocaine, also cannot be made and distributed without first going through a processing procedure, which is generally accomplished by either baking or distilling raw cocaine.  Once processed, all of the drugs must be packaged in

---

[6] The individuals who were involved in the "smuggling arm" of the conspiracy were: Darius Ames, Je Bradford, Charles Brown, Brian Doy, Huber Garcia, James Ingram, and Tyrone Thomas.

[7] Rather, as the government's drug expert, Detective A.O. Washington, testified, the cocaine in this case generally originates in South America, while the heroin at issue in this case generally originates in South America, Central America, and Asia.  (*See* Trial Tr. Oct. 25, 2006, p.m.)

small quantities so that the users can afford to purchase the drugs.  Accordingly, the individuals

in the processing arm of the conspiracy were essential to the success of the conspiracy's goal of

selling drugs for profit because, without them, the drugs would not be ready for street-level

consumption by end-users.

Next, the success of the conspiracy's goal of profit obviously depended upon the sale of

the processed and packaged drugs by the members of the distribution arm of the conspiracy.  This

was accomplished by the street-level members of the conspiracy, including Ricky Gore, Chester

Craig Simon, Eric Allison, Victoria Owens, Vincent Goldston, and Jay Ingram, who each sold

the drugs at issue in this case to individuals on the street.

Finally, these four links in the chain conspiracy were coordinated by the heads of the

enterprise, defendants Eiland and Miller, in order to achieve the common goal of profiting from

the sale of drugs in the Washington, D.C. area.  The evidence showed that defendants Eiland and

Miller co-managed the enterprise.  Defendants Eiland and Timothy Thomas pooled $50,000 in

cash to purchase five kilograms worth of cocaine.[8]  (Trial Tr., 72-76, Oct. 10, 2006, p.m.)

Additionally, defendant Miller arranged for narcotics to be mailed to Charles Brown's residence.

(Trial Tr., 32, Oct. 18, 2006.)  In addition to his involvement as a financial investor in the drug

conspiracy, defendant Timothy Thomas was used by defendants Eiland and Miller as an advisor

in the drug trade.[9]  Defendant Timothy Thomas was also responsible for recruiting Tyrone

Thomas to use his limousine service as a means to smuggle the drugs into the Washington, D.C.

---

[8] *See supra* note 4.

[9] Defendant Timothy Thomas' involvement in the drug conspiracy at issue will be talked about at greater length in this Court's forthcoming Memorandum Opinion in response to defendant Timothy Thomas' Omnibus Motion [755] for Judgment of Acquittal or, in the alternative, Motion for New Trial, and the Supplement [930] to that Motion.

area.  Finally, defendant Gaskins acted as an administrative assistant to coordinate the logistical

aspect of the conspiracy, such as purchases of plane tickets for the members to travel to obtain

and smuggle the drugs, cell phones to negotiate drug transactions, and the apartments where the

drugs were stashed and processed.

From this evidence, it is overwhelmingly clear "that each conspirator has agreed with the

others (some whose specific identity may be unknown) to further a common unlawful objective,

e.g., the distribution of narcotics."  *Tarantino*, 846 F.2d at 1393.  The entire common goal of

profiting from the sale of drugs would not have occurred without the street-level sale of the drugs

at issue in this case by the distribution arm of the conspiracy.  Of course, the distribution arm

could not sell any drugs without the efforts of the members of the smuggling arm, who brought

the non-indigenous drugs into the area, and the members of the processing arm, who diluted,

processed, and packaged the drugs so that they could be consumed at by end-users on the street.

Finally, none of these arms could function cohesively without the leadership defendants Eiland,

Miller, Timothy Thomas, and Gaskins, who funded, organized, and coordinated the overall

activities of the drug conspiracy so that its common goal of profit could be accomplished.

Accordingly, the Court finds in this case that there was sufficient interdependence between the

heads of the conspiracy and its various arms to support the existence of a single chain conspiracy.

### 3. *Evidence Shows Overlap of Core Participants in Conspiracy*

Third, the evidence clearly indicates that defendants Eiland and Miller were "core

participants" in the conspiracy who are linked to the other conspirators in the case.  Through

defendant Timothy Thomas, defendants Eiland and Miller directed Tyrone Thomas to smuggle

$50,000 to Phoenix, Arizona, and to smuggle back the five kilograms of cocaine that defendant

Eiland was to purchase with that money.[10]  Defendant Miller requested that Charles Brown accept a parcel of narcotics that was mailed to Brown's residence.  Defendant Eiland, along with Darius Ames and Jay Ingram flew together to Phoenix, Arizona at defendant Eiland's request in order to purchase narcotics and to smuggle heroin back into the Washington, D.C. area by plane. Defendant Eiland directed Darius Ames to process the smuggled heroin so that it could be sold on the street.  Defendant Eiland also told Ricky Gore to distribute the drugs to the street-level dealers so that they could be sold.  Eiland also ordered Brian Lipscombe to kill Sorenson Oruchie.  Finally, wiretap evidence shows that defendants Eiland and Miller were in regular telephone contact and discussed their narcotics activity with each other.  From this evidence, it is clear that defendants Eiland and Miller were the common link between each of the separate interdependent arms of the drug conspiracy at issue in this case.

*4.     Conclusion*

In conclusion, there is ample evidence upon which a reasonable juror might fairly conclude beyond a reasonable doubt that a single chain conspiracy exists under the standard set forth in *Tarantino*.  The conspirators clearly had a common goal of profiting from the sale of narcotics in the Washington, D.C. area.  Each of the arms of the conspiracy were interdependent upon each other in ensuring that this common goal was realized.  And, defendants Eiland and Miller were "core participants" who provided a common link between the various separate arms of the conspiracy.  Accordingly, defendant Eiland's "fatal variance" argument must fail.

*B.     Issue of Prejudice*

Even if the evidence had demonstrated that multiple independent conspiracies existed

---

[10]  *See supra* note 4.

instead of a single overarching conspiracy, defendant Eiland's "fatal variance" argument still fails because he cannot demonstrate that his rights were substantially prejudiced.  Defendant Eiland argues that he was prejudiced by the transference of guilt that resulted from the fact that the government was allowed to introduce evidence concerning multiple conspiracies such that "the jury was substantially likely to transfer evidence from one conspiracy to another."  (Eiland Mot. [910] 2, 4.)  This conduct, the defendant argues, amounts to "the prohibited use of character testimony" under Rule 404(b) of the Federal Rules of Evidence, which the jury would naturally only consider as propensity evidence against defendant Eiland.  (Eiland Mot. [910] 4.)  As a result, defendant Eiland argues that the government was essentially allowed "to launch a whole sale attack on the defendant [which made] it virtually impossible for a jury to strictly follow the instruction on multiple conspiracy."  (*Id.*)  Defendant Eiland's argument fails for three reasons.

First, there is no risk that the jury was confused or unable to strictly follow the Court's instructions on the single and multiple conspiracies.  As the D.C. Circuit has repeatedly found, "[a] jury is presumed to follow a trial court's instructions," particularly when the judge's instructions to the jury are clear, concise and careful.  *United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000); *United States v. Jackson*, 627 F.2d 1198, 1213 (D.C. Cir. 1980).  Here, the Court very clearly instructed the jury regarding the issue of single versus multiple conspiracies.  Specifically, the Court stated with respect to the charge of "Conspiracy to Violate Narcotics Law" that "[i]f you [the jury] find that the evidence at trial did not prove the existence of the single overall conspiracy charged, or instead established other or different conspiracies, none of which are charged in the Indictment, *you must find the defendants not guilty* . . . ."  (Jury Instructions at

50 (emphasis added).)[11]  Such an instruction clearly, carefully, and concisely delineates the

situations under which the jury could find the defendants guilty and not guilty of conspiracy.

Accordingly, defendant Eiland cannot show prejudice against the defendant relating to the jury's

understanding of the instructions given it by the Court.

Second, the number of co-defendants tried in this particular case is sufficiently small so

as to mitigate the risk of "spillover prejudice" that might result from the jury imputing evidence

from one conspiracy to another defendant involved in another conspiracy.  *See Gaviria*, 116 F.3d

at 1533.  As the D.C. Circuit pointed out in *Gaviria*, the risk of such spillover prejudice

decreases and is less likely when fewer co-defendants are tried at the same time.  *Id.*  The *Gaviria*

Court found that there was a minimal risk of spillover prejudice, if any, when four defendants

were tried at the same time.  *Id.*; *cf. United States v. Alessi*, 638 F.2d 466, 475 (2d Cir.1980)

(holding that 10 defendants was a sufficiently small number for jury to give individual

consideration to each defendant).  Similar to the defendants in *Gaviria*, only four defendants

were tried together in this trial.  Therefore, this Court finds that the risk of spillover prejudice

was minimal in this case.

Third, the risk of spillover prejudice is lessened even further due to the nature of the

---

[11] The Court explained further:

> This is so even if you find that some conspiracy other than the one charged in this Indictment existed, and even though the purposes of both conspiracies may have been the same and there may have been some overlap in membership.  Proof of several separate conspiracies is not proof of the single overall conspiracy charged in the Indictment. What you must determine is whether the single conspiracy as charged in Count 1 existed between two or more conspirators.  If you find that no such conspiracy existed, you must acquit the defendants of this charge.

(*Id.*)

evidence presented in this case.  A jury is less likely to impute evidence from one conspiracy to

another defendant "when the Government presents tape recordings of individual defendants . . .

so that the jury has 'no need to look beyond each defendant's own words in order to convict.'"

*Gaviria*, 116 F.3d at 1533 (quoting *United States v. Anderson*, 39 F.3d 331, 348 (D.C.

Cir.1994)).  Moreover, the risk of spillover prejudice is weakened further if the evidence shows

that the defendant "played a role in all aspects of the conspiracy."  *Gaviria*, 116 F.3d at 1533.

Here, the government presented tape recordings of phone calls between defendants Eiland and

Miller that showed their involvement as managers and heads of the drug conspiracy.  Further, as

noted previously, the evidence shows that defendants Eiland and Miller were the core

participants who acted as common links between each of the separate arms of the conspiracy.

*See supra* Section II.A.3.  Therefore, even if the evidence pointed to the existence of separate

conspiracies, neither defendant Eiland nor defendant Miller would be victims of spillover

prejudice because each would have been deemed a participant in each separate conspiracy.  *See*

*Gaviria*, 116 F.3d at 1533.  For the foregoing reasons, defendant Eiland has failed to show that

his rights were substantially prejudiced at trial.

     *C.*    *Conclusion*

     Defendant Eiland has failed to establish that the evidence proves the existence of multiple

independent conspiracies.  Even if the evidence did point to the existence of multiple

independent conspiracies, defendant Eiland has still failed to prove that his rights were

substantially prejudiced by the introduction of this evidence.  Accordingly, this Court finds that

defendant Eiland's "fatal variance" argument must fail.  Therefore, defendant Eiland's motion for

judgment of acquittal or, in the alternative, for a new trial, must be DENIED.

III.     *Defendant Frederick Miller's Motion* [911] *for Acquittal or Alternatively for a New Trial*

In his motion, defendant Miller makes three separate arguments. Defendant Miller's first argument stems from the fact that he was tried twice before this Court and a jury. Specifically, defendant Miller contends that inconsistencies between the jury's respective verdicts against the defendant in the first and second trials necessitate that this Court reverse a number of the defendant's convictions from the first trial.[12] (Miller Mot. [911] 3.) Second, like defendant Eiland, defendant Miller argues that his conviction of participation in a single conspiracy was insufficiently supported by the evidence, and that a variance exists between the evidence shown at trial and the indictment.[13] (Miller Mot. [911] 4-5.) Finally, defendant Miller argues that he is entitled to a new trial because he was denied his right to counsel of his choice in the second trial. The Court will take each of these arguments in turn.

A.     *Issue of Inconsistent Verdicts*

Defendant Miller was tried before this Court on two occasions. During the first trial, the jury convicted the defendant of, *inter alia*, a number of counts relating to the trafficking, purchase, and sale of PCP. Defendant Miller was tried a second time before this Court for those counts on which the jury from the first trial was unable to reach a unanimous verdict. The jury from the second trial acquitted defendant Miller on each count relating to the trafficking, purchase, and sale of PCP. Accordingly, defendant Miller argues that he is entitled to a judgment of acquittal on the guilty verdicts rendered against him on the PCP counts during the first trial

---

[12] Defendant Miller seeks only a judgment of acquittal on the basis of this argument. (*See* Miller Mot. [911] 3.)

[13] Defendant Miller seeks either a judgment of acquittal or, in the alternative, a new trial on the basis of this argument. (*See* Miller Mot. [911] 4-5, 9.)

because those guilty verdicts are inconsistent with acquittals handed down by the jury for

similar–albeit different–counts in the second trial.  Defendant Miller's argument fails for two

reasons.

First, the Court lacks the authority to entertain a motion for a judgment of acquittal on the

guilty verdicts from the first trial–let alone the authority to grant such a motion–because the

defendant's motion is untimely.  According to the Federal Rules of Criminal Procedure, motions

for a judgment of acquittal must be made "within 7 days after a guilty verdict or after the court

discharges the jury, whichever is later, or within any other time the court sets during the 7-day

period." Fed. R. Crim. P. 29(c)(1).  As the Supreme Court has stated, the rules governing the

timeliness of filing post-verdict motions for judgment of acquittal are "plain and unambiguous,"

and unopen to interpretation. *Carlisle v. United States*, 517 U.S. 416, 421 (1996).  "There is

simply no room in the text of Rules 29 and 45(b) for the granting of an untimely postverdict

motion for judgment of acquittal, regardless of whether the motion is accompanied by a claim of

legal innocence, is filed before sentencing, or was filed late because of attorney error." *Id.*

Accordingly, this Court must strictly construe the provisions of Rule 29 in evaluating the

timeliness of the defendant's motion for judgment of acquittal.

Here, the jury in the first trial reached its guilty verdicts against defendant Miller on the

PCP counts on June 19, 2006.  Defendant Miller did not move within seven days of those

verdicts in the first trial for a judgment of acquittal on those counts, nor did he seek an extension

of time under which he could file a motion for judgment of acquittal.  Rather, defendant Miller

only made a motion for a judgment of acquittal after the jury from the second trial rendered its

guilty verdicts against him.[14]   A motion for judgment of acquittal made as to a verdict from a

subsequent trial may not extend to a verdict from an altogether separate previous trial, even if the

defendant is being retried on some counts.   *See* Fed. R. Crim. P. 29(c)(1).   Therefore, though

defendant Miller's motion was timely as to the guilty verdicts from the second trial, it does

not–and cannot–apply to the guilty verdicts from the first trial.   Accordingly, defendant's motion

cannot be granted because it was not timely filed.

Second, even if the defendant's motion as to the first set of verdicts was timely filed,

inconsistent verdicts are generally not grounds to justify reversal of a conviction.[15]   As the D.C.

Circuit notes, "[a] criminal defendant . . . may not attack his conviction on one count solely

because it is inconsistent with the jury's acquittal on another [count]."   *United States v. Laing*,

889 F.2d 281, 288 (D.C. Cir. 1989).   This is due to the fact that, as the Supreme Court has

uniformly held, "[c]onsistency in the verdict is not necessary."   *Dunn v. United States*, 284 U.S.

390, 393 (1932).   Indeed, "[w]hile symmetry of results may be intellectually satisfying, it is not

required."   *Standefer v. United States*, 447 U.S. 10, 25 (1980) (citing *Hamling v. United States*,

418 U.S. 87 (1974)).   Rather, the "the "simple, if discomforting, reality [is] that 'different juries

may reach different results under any criminal statute. That is one of the consequences we accept

under our jury system.'"   *Id.* (quoting *Roth v. United States*, 354 U.S. 476, 492, n. 30 (1957)).

In light of this well-settled precedent, the fact that the juries from each separate trial

rendered verdicts that the defendant finds inconsistent does not justify a judgment of acquittal on

---

[14] The jury in the second trial issued its verdicts against defendant Miller on December 5, 2006.  Defendant Miller requested in open court a thirty-day extension to file his motion for judgment of acquittal on these counts from the second trial.  This Court granted the defendant's motion.

[15] Defendant Miller concedes as much in his motion.  (*See* Miller Mot. [911] 3.)

the defendant's convictions in the first trial.  Accordingly, defendant Miller's motion for judgment

of acquittal on the basis of inconsistent verdicts must be DENIED.

   B.      *Whether Variance Exists Between Indictment and Evidence Shown at Trial*

      Next, defendant Miller contends–as did defendant Eiland–that he is entitled to either a

judgment of acquittal or a new trial with respect to the guilty verdicts against him in the second

trial on the basis that the government failed to prove that he was involved in the single

overarching drug conspiracy charged in the indictment.  (Miller Mot. [911] 4-5, 9.)  As it did

with defendant Eiland's claims, the government counters that no such variance exists in this case.

The government argues instead that the evidence clearly establishes that the drug conspiracy at

issue in this case was a classic "chain conspiracy," in which each conspirator performed

particular interdependent roles in furthering the conspiracy and its goals.  (*See* Gov.'s Opp. Mot.

[956] 9.)

      In light of the extremely similar level of involvement and activity that defendants Eiland

and Miller had with the drug conspiracy at issue in this case, the Court finds that the justification

offered for its denial of defendant Eiland's motion for a judgment of acquittal or a new trial

applies with equal force to the like motion from defendant Miller.  *See supra* Section II.A-C.  In

the interests of brevity, the Court will not restate the evidence here.  Suffice to say, defendant

Miller has not proven either: "(1) that the evidence at trial established facts materially variant

from those alleged in the indictment, [or] (2) that the variance caused substantial prejudice."

*Tarantino*, 846 F.2d at 1391.  Based on the evidence set forth at trial, it is clear that a single

overarching conspiracy existed, that defendant Miller was an integral part of it, and that–even if

the evidence proved multiple conspiracies–defendant Miller has failed to establish any

substantial prejudice against him.  Therefore, for the reasons stated previously with respect to

defendant Eiland, the Court finds that it cannot grant defendant Miller's motion for a judgment of

acquittal or a new trial on the grounds of a variance between the indictment and the evidence

presented at trial.

C.      *Whether Defendant Has Right to "Choice of Counsel"*

During the first trial, defendant Miller was represented by Brian McDaniel, Esq.  The jury

during the first trial hung on many of the counts against defendant Miller.  As a result, the Court

proposed joining defendant Miller with defendants Eiland, Gaskins, and Robert Bryant, who

were scheduled to be tried in September 2006.  Mr. McDaniel indicated, however, that he was

unable to represent defendant Miller in this second trial due to preexisting scheduling conflicts.

The defendant and government briefed the issue fully, and the Court heard argument on the issue,

after which the Court appointed Thomas Saunders, Esq. to represent defendant Miller in the

second trial.  Defendant Miller argues that this Court erroneously denied him his right to "choice

of counsel" in the second trial by appointing Mr. Saunders to represent him instead of Mr.

McDaniel, with whom the defendant had already developed an attorney-client relationship.

The Sixth Amendment of the United States Constitution provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his

defence."  U.S. Const. amend. VI.  Following this prescription, and in order to ensure that the

defendant receives a fair trial, the Supreme Court held in the landmark case of *Gideon v.*

*Wainright*[16] that counsel must be appointed for an indigent defendant charged with a felony.  *See*

*also Strickland v. Washington*, 466 U.S. 668, 689 (1984) (finding that the purpose of granting a

---

[16] 372 U.S. 335 (1963).

defendant the right to counsel "is simply to ensure that criminal defendants receive a fair trial").

The Supreme Court also has held that the Sixth Amendment right to counsel extends to

defendants the right to select and be represented by an attorney of the defendant's choice.  *United*

*States v. Wheat*, 486 U.S. 153, 159 (1988).  Notwithstanding this right to choice of counsel,

however, the Supreme Court was quick to note that "the essential aim of the [Sixth] Amendment

is to guarantee an effective advocate for each criminal defendant rather than to ensure that a

defendant will inexorably be represented by the lawyer whom he prefers."  *Id.*

     For these reasons, the Supreme Court has found that the right to choose one's counsel is

not absolute, and that the right to choice of counsel applies only to a defendant who does not

require appointed counsel.  *Wheat*, 486 U.S. at 159 ("a defendant may not insist on representation

by an attorney he cannot afford . . . ."); *see also United States v. Gonzales-Lopez*, 126 S. Ct.

2557, 2561 (2006) ("We have previously held that an element of this right [to counsel] is the

*right of a defendant who does not require appointed counsel* to choose who will represent him.")

(emphasis added).  Put simply, a defendant "has no constitutional right to *appointed* counsel of

choice."  *Childress*, 58 F.3d at 736 (citing *Wheat*, 486 U.S. at 159); *see also United States v.*

*Friedman*, 849 F.2d 1488, 1490 (D.C. Cir. 1988) ("One of the express limitations upon the right

to choose one's own attorney is that the criminal defendant be 'financially able' to retain his

counsel of choice.").

     Here, both Mr. McDaniel and Mr. Saunders are attorneys appointed by the Court to assist

defendant Miller with his defense of the charges brought against him by the government.

Accordingly, the Court finds that it did not–and could not–deny defendant Miller his right to

counsel of his choice because defendant Miller did not possess such a right in the first place due

to the fact that his attorneys were appointed by the Court.

Still, defendant Miller argues that his case is altogether distinguishable due to the fact that he and Mr. McDaniel had already established an attorney-client relationship.  Citing Justice Brennan's opinion concurring in the judgment in *Morris v. Slappy*,[17] defendant Miller argues that inherent within the right to counsel under the Sixth Amendment is the importance of ensuring the defendant's relationship with his attorney.  (Miller Mot. [911] 8-9.)  Accordingly, defendant Miller asserts that any action by the Court to disrupt this relationship violates the spirit of the Sixth Amendment.  (*Id.*)

Defendant Miller's argument is flawed, and therefore must fail.  In *Slappy*, the Supreme Court majority, standing in stark contrast to Justice Brennan's opinion concurring in the judgment, refused to find that an appointed counsel with whom the accused did not have a "meaningful relationship" was the equivalent of no counsel.  *Slappy*, 461 U.S. at 14 n.6.[18] Instead, the Court noted that "[n]o court could possibly guarantee" such a meaningful relationship between a defendant and his attorney.  *Id.* at 13-14.  Therefore, the Court summarily rejected the notion that the Sixth Amendment guarantees a meaningful relationship between the accused and his counsel, finding such a guarantee "without basis in the law."  *Id.*  Along these same lines, the D.C. Circuit held that "it is well settled that a defendant is not denied the right to choice of counsel if he is unable to afford the 'best' counsel and *must, as a consequence, settle for another, perhaps court-appointed attorney*."  *Friedman*, 849 F.2d at 1490 (emphasis added)

---

[17] 461 U.S. 1, 22-23 (1983) (Brennan, J., concurring in the judgment).

[18] Justice Brennan readily acknowledges his variance with the Court majority on this point.  *See id.* at 15, 19 (Brennan, J., concurring in the judgment).

(citing *Slappy*, 461 U.S. 1 (1983)).

It is clear that defendant Miller's case falls squarely within the strictures set by the Supreme Court in *Slappy* and the D.C. Circuit in *Friedman*. A defendant is not constitutionally entitled to any more of a meaningful relationship with his court-appointed attorneys than to be competently and effectively represented by those court-appointed attorneys. There is no contention that the defendant received either incompetent or ineffective representation from either Mr. McDaniel or Mr. Saunders over the course of his two trials. Therefore, this Court finds that defendant Miller's right to choice of counsel was not denied when this Court appointed Mr. Saunders to represent the defendant instead of Mr. McDaniel. Accordingly, defendant Miller's request for a new trial on the basis that he was denied the right to counsel of his choice must be DENIED.

IV.     *Defendant Alvin Gaskins' Motion [909] for Judgment of Acquittal or for a New Trial*

In his motion, defendant Gaskins makes three separate arguments. Defendant Gaskins first argues that he is entitled to a judgment of acquittal because the government failed to prove that he knew he was participating in a narcotics conspiracy. (Gaskins Mot. [909] 8.) Next, defendant Gaskins argues that the Court's instructions to re-deliberate effectively coerced the jury into rendering a final verdict against defendant Gaskins.[19] (*Id.* at 23.) Finally, defendant Gaskins argues that he is entitled to judgment of acquittal or a new trial because the jury's internally inconsistent verdict indicates that the jury intended to acquit defendant Gaskins. (*Id.* at 13, 15, 21.) The Court will take each of these arguments in turn.

A.     *Sufficiency of Evidence of Scienter*

---

[19] Defendant Gaskins seeks only a new trial on the basis of this argument.

Defendant Gaskins first contends that he is entitled to a judgment of acquittal because the government failed to prove that he had the requisite knowledge that he was participating in a conspiracy.  As the D.C. Circuit has found, a defendant acts "knowingly" when the defendant "realized what she was doing and was aware of the nature of her conduct and did not act through ignorance, mistake or accident." *United States v. Alston-Graves*, 435 F.3d 331, 338 (D.C. Cir. 2006).  An individual's knowing participation in a chain-type conspiracy can be determined by the use of both direct and circumstantial evidence.  *Id.* at 339 (citing *United States v. Gallo*, 543 F.2d 361, 367 (D.C. Cir.1976)); *Tarantino*, 846 F.2d at 1393, 1396 (finding jury entitled to infer from other evidence that defendant knew of illegal nature of drug conspiracy).

In the present case, the evidence clearly shows that defendant Gaskins knew he was participating in a drug conspiracy.  Defendant Gaskins provided material logistical support for the conspiracy and its efforts by purchasing and renting above-the-board items with the knowledge that these items would be used in the distribution of illegal drugs.  For example, defendant Gaskins made flight arrangements for members of the conspiracy to fly to and from the Washington, D.C. area in order to negotiate multiple drug deals.  Additionally, defendant Gaskins used his own name and address on the applications in purchasing a number of cell phones.  Once the phones were purchased, however, defendant Gaskins gave them away to defendant Miller, who used these cell phones to coordinate various transactions in furtherance of the drug conspiracy.  (Trial Tr., 85-86, Oct. 4, 2006.)  Defendant Gaskins also personally signed the application for an apartment (B1510), on which he stated that he would be the sole occupant of the apartment.  And yet, defendant Gaskins never once lived in apartment B1510.  Rather, the evidence shows that the conspirators used apartment B1510 as a stash house for processing drugs

and counting money in furtherance of the conspiracy.  In particular, the apartment was used by defendants Eiland and Miller, as well as Darius Ames, who testified that, inside apartment B1510, he processed heroin and helped count hundreds of thousands of dollars received from selling drugs.

Still, defendant Gaskins argues that these activities were completely innocuous, and that he was merely working as an administrative assistant and office manager on behalf of defendant Miller's private investigation firm, Dream Team Investigations ("DTI").  Considering the evidence in its totality, and in a light most favorable to the government, the Court finds defendant's argument completely incredible for a number of reasons.  First, defendant Gaskins' contentions that his actions on behalf of DTI were legitimate overlooks the glaring fact that DTI had absolutely no legitimate source of income whatsoever.  DTI was apparently a detective agency designed to provide investigative services to help exonerate defendants in both federal district court and in Superior Court in Washington, D.C.  And yet, the government established at trial that DTI received absolutely no funds from either the federal district court nor superior court CJA funds, from which DTI would presumably have gotten money for any services rendered. This is corroborated by the fact that, at no time during the phone calls in which defendant Gaskins was asked to assist defendant Miller did defendant Gaskins ever ask which client or account was to be billed for the work.  This evidence casts an obvious pall over the legitimacy of any expenditures and actions defendant Gaskins made on behalf of DTI and makes it clear that these actions and expenditures were not financed by any ordinary or legitimate means.

Second, defendant Gaskins' deliberate relinquishment of dominion and control over the items he secured in his name is entirely suspect and is indicative of his knowledge of and

participation in the criminal scheme at issue.  Though purchasing cell phones and renting

apartments in one's own name are ordinarily legitimate practices, defendant Gaskins' immediate

relinquishment of the items firmly establishes that defendant Gaskins never purchased or rented

the items with the intent to use them personally.  Without any personal reasons for using these

items, defendant Gaskins obviously intended to purchase and rent these items for use by others.

In this case, the evidence points only to the other members of the conspiracy who used these

items directly to further the conspiracy.  Further, the fact that this happened on more than one

occasion further cements the finding that defendant Gaskins' actions were not a result of

"ignorance, mistake or accident."

From this evidence, it is pellucidly clear beyond any doubt that defendant Gaskins'

actions as a logistical administrator were not legitimate.  Accordingly, the Court finds that the

evidence shows that defendant Gaskins acted with the requisite knowledge that he was

participating in a drug conspiracy.  Therefore, defendant Gaskins' motion for judgment of

acquittal on the basis of a lack of scienter must be DENIED.

  B.  *Whether Jury's Verdict Was Result of Coercion by the Court*

In its initial verdict, the jury returned a verdict of guilty against defendant Gaskins for

narcotics conspiracy, but indicated that no drugs were proven.  In light of this internal

inconsistency, the Court instructed the jury that they must find either that the government proved

the conspiracy *and* proved at least one controlled substance, or that the government failed to

prove the conspiracy and failed to prove at least one controlled substance.  Defendant Gaskins

seeks a new trial on the grounds that the Court's actions in instructing the jury after it rendered its

internally inconsistent verdict was coercive in nature, and ultimately caused the jury to render a

Case 1:04-cr-00379-RCL   Document 994   Filed 11/27/07   Page 27 of 30

final guilty verdict against defendant Gaskins for narcotics conspiracy.

"The [Sixth Amendment of the] Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of *every* element of the crime with which he is charged." *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995) (emphasis added). As a result, a jury verdict that does not reach each element of the charged crime cannot be considered a final verdict under the Sixth Amendment. *See Sullivan v. Louisiana*, 508 U.S. 275 277-78, 280 (1993); *cf. Gaudin*, 515 U.S. at 522-23. Accordingly, a jury's final verdict that the defendant is guilty is an indication that every element of the crime with which the defendant is charged has been proven beyond a reasonable doubt. *See Gaudin*, 515 U.S. at 522-23.

An inconsistency in the verdict arises, however, when–as here–a portion of the jury's verdict indicates that the defendant is guilty of the overall crime itself, but that the government has not proved an essential element of that same crime beyond a reasonable doubt. Though verdicts on several counts need not be consistent with each other,[20] a verdict as to a single count "must be consistent in itself. . . . [T]hat is, whether the evidence supports the verdict." *United States v. Daigle*, 149 F. Supp. 409, 413 (D.D.C. 1957) (quoting *Mogoll v. United States*, 158 F.2d 792, 793 (5th Cir. 1947)). Therefore, a verdict can only be consistent within itself if the evidence supports every element of the crime with which the defendant is charged.

When an inconsistency within the verdict arises, it has been recognized within this district that "[c]ourts have the power to correct any uncertainty in a verdict before discharging the jury." *Daigle*, 149 F. Supp. at 415. As the D.C. Circuit has found, this power includes the authority to ask the jury to re-deliberate in order to rectify the uncertainty or inconsistency within a particular

---

[20] *See supra* Section III.A.

27

jury verdict.  *See United States v. Wolford*, 444 F.2d 876, 887 (D.C. Cir. 1971) (finding that the district court did not err when it re-instructed the jury and asked the jury to re-deliberate after it had delivered a verdict based on a misinterpretation of the court's instructions).  Courts in our sister Circuits have also recognized this view.  *See, e.g.*, *United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989) ("a district judge has authority to require redeliberation in cases in which there is uncertainty, contingency, or ambiguity regarding the jury's verdict."); *United States v. Mears*, 614 F.2d 1175, 1179 (8th Cir. 1980) (finding that the district court erred in permitting the jury to correct its verdict); *Helms v. United States*, 310 F.2d 236, 240 (5th Cir. 1962) (same).

In the present case, the Court was presented with a single verdict against defendant Gaskins that he was guilty of narcotics conspiracy.  Attached to this verdict, however, was the jury's indication that one of the essential elements–proof of at least one controlled substance–was not proven beyond a reasonable doubt.  Naturally, such a verdict is internally inconsistent within itself because the finding that the defendant was guilty of the overall crime itself is at odds with the notation that one of the essential elements of the crime was not proven.  In light of this inconsistency within the verdict against defendant Gaskins, the Court finds that its instruction to the jury to resume deliberations was proper to correct this inconsistency, and that such an instruction is not, by itself, coercive.

Nor was the Court coercive in its method of re-instructing the jury after it returned with this internally inconsistent single verdict against defendant Gaskins.  The Court informed the jury that, if the jury found the defendant guilty of narcotics conspiracy, it had to also find that the government proved a particular controlled substance.  The Court also stated to the jury that, if the jury found that each of the drugs was not proven by the government, then the jury *must* find the

28

defendant not guilty of narcotics conspiracy.  The Court then asked the jury to resume its

deliberations so that it could sort out this internal inconsistency.  At no point did the Court favor

one result over the other.  Accordingly, defendant Gaskins' motion for a new trial on grounds that

the jury's verdict was coerced must be DENIED.

C.       *Defendant Gaskins' Additional Arguments for Judgment of Acquittal and New*

*Trial on the Basis of the Jury's Internally Inconsistent Verdict*

Finally, defendant Gaskins raises two additional claims based upon the jury's internally

inconsistent verdict.  First, defendant Gaskins argues that the jury somehow acquitted him by

finding him guilty of a conspiracy not charged in the indictment.  According to this so-called

variance argument, defendant Gaskins contends that "the jury decided that defendant was

involved in a conspiracy, for which he acquired the apartment and other evidence submitted by

the government, but that the conspiracy was distinct from the drug conspiracy . . . because no

drugs were found as part of that conspiracy as charge [sic] in the indictment."  (Gaskins Mot.

[909] 14.)  Second, defendant Gaskins asserts that the jury's inconsistent verdict shows that it

found that an essential element of the charged drug conspiracy was missing.  Specifically,

defendant Gaskins maintains that the jury's initial verdict form, which stated that no drugs were

proven, indicates the jury's belief that the government failed to prove an essential element of the

charged drug conspiracy.

For the same reasons stated in the previous section, however, the Court must also deny

defendant Gaskins' additional arguments.  Both arguments must fail because they rely on the

flawed notion that the jury's initial verdict was a final verdict.  In fact, however, a single

internally inconsistent verdict such as the jury's initial verdict in this case is not a final verdict

29

within the context of the Sixth Amendment because it does not reach the merits of each element

of the crime.  *See supra* Section IV.B.[21]  The inconsistency created by the jury's decision that the

government proved the defendant's guilt of the overall crime, but that it had not proven one of the

essential elements of that crime counteracts both findings, and renders each meaningless.

Therefore, the jury's internally inconsistent verdict against defendant Gaskins could not have

acted as an acquittal of him in either instance because the jury had not reached an internally

consistent final verdict against him in one way or another.[22]  Accordingly, the Court finds that

defendant Gaskins' motions for judgment of acquittal and a new trial on the grounds of the jury's

internally inconsistent verdict must also be DENIED.

### III.  CONCLUSION

Upon a thorough review of each party's filings, the applicable law and the entire record

herein, this Court has determined that the respective motions for judgments of acquittal and in

the alternative for new trials filed by defendants Eiland [910], Miller [911], and Gaskins [909] be

DENIED.

A separate Order shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, November 27, 2007.

---

[21] Were this not the case, courts surely would lack the power to be able to rectify internal inconsistencies within a jury's verdict.

[22] Notwithstanding the defendant's arguments to the contrary, this type of internally inconsistent verdict from a unanimous jury is different from a verdict to acquit the defendant. The former is a verdict that cannot logically stand–the government cannot simultaneously have proven that the defendant committed all the elements of a crime, but not have proven that the defendant committed one of those same elements.  A verdict to acquit the defendant, by contrast, indicates a jury's final decision simply that the government has failed to prove at least one of the elements of the crime as to the defendant.  It is the jury's verdict of the defendant's overall guilt of the crime that creates this important distinction.