UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 04-cr-379-RCL-6 |
| ALVIN M. GASKINS, | |
| *Defendant.* | |

## MEMORANDUM ORDER

The Court and the parties met recently to discuss next steps in potential discovery regarding Defendant Alvin Gaskins' pending certificate of innocence. During the status conference, the Court stated that an order addressing such discovery would be forthcoming. This is that order. Specifically, the Court will order the government to produce unredacted copies of certain Federal Bureau of Investigation ("FBI") records and bank records related to Dream Team Investigations ("DTI"). Additionally, Gaskins will be permitted to submit limited interrogatories and document requests in accordance with the Federal Rules of Civil Procedure.

## I.   BACKGROUND

In 2004, Alvin Gaskins and twenty other defendants were charged with various crimes related to a narcotics-distribution conspiracy that operated in the District of Columbia, Maryland, and Virginia between 1999 and 2004. *United States v. Gaskins* ("*Gaskins I*"), 690 F.3d 569, 572 (D.C. Cir. 2012). In 2006, Gaskins and three codefendants—Gerald Eiland, Frederick Miller, and Robert Bryant—went to trial. *Id.* at 572. The jury found Gaskins guilty of conspiracy to distribute more than 100 grams but less than one kilogram of heroin. *Id.* at 576. In 2008, this Court sentenced Gaskins to 262 months of incarceration. *See id.* Gaskins appealed and, in 2012, the Circuit reversed the conviction after finding that it was not supported by sufficient evidence. *Id.* at 576, 582. In

total, Gaskins served almost eight years of his nearly twenty-two-year sentence before his release. *United States v. Gaskins* ("*Gaskins II*"), No. 1:04-cr-379 (RCL), 2019 WL 7758898, at *1 (D.D.C. Dec. 13, 2019).

In 2017, Gaskins moved in this Court for a certificate of innocence, pursuant to 28 U.S.C. § 2513. Def.'s Mot. for Certificate of Innocence, ECF No. 1237. The government opposed. Gov't Opp'n, ECF No. 1242. Nearly a year later, Gaskins moved for the Court to open limited discovery and set an evidentiary hearing on the motion. Mot. for Disc. & for Evidentiary Hr'g, ECF No. 1257. The Court denied Gaskins' motion for certificate of innocence without ruling on his discovery or evidentiary hearing requests. *See generally Gaskins II*, 2019 WL 7758898. Gaskins appealed and, in 2021, the Circuit vacated this Court's order and remanded the case for this Court to address Gaskins' procedural motion.[1] *United States v. Gaskins* ("*Gaskins III*"), 6 F.4th 1350 (D.C. Cir. 2021). According to the Circuit, "Gaskins' requests aimed at developing the key factual issue of his own state of mind," even though the Circuit acknowledged that "with 'an inchoate crime like conspiracy, . . . your best evidence' is '[w]hat is in Mr. Gaskins' mind.'" *Id.* at 1362–63 (citing Oral Arg. Tr. at 24:21–22, 36:14–15).

On February 2, 2023, the Court and the parties met for a status conference to discuss next steps on remand. Minute Entry (02/07/2023). The Court ordered the parties to meet and confer regarding a proposed scheduling order for discovery. On March 22, 2023, the parties jointly submitted an update detailing their conversations regarding, and disagreements about, the content and scope of the limited discovery. ECF No. 1308. On March 24, 2023, the Court and the parties

---

[1] Key to the Circuit's reasoning appears to be the fact that the government did not oppose Gaskins' discovery request either in their briefing or at oral argument. *See, e.g., United States v. Gaskins* ("*Gaskins III*"), 6 F.4th 1350, 1357 (D.C. Cir. 2021) ("The government never opposed Gaskins' motion for limited discovery and an evidentiary hearing"); *id.* at 1364 ("The government's acquiescence to Gaskins' procedural requests naturally raises the prospect of their being granted"). At oral argument, the government explained that it did not respond to Gaskins' motion because the Court had not ordered a response. *See* Oral Arg. Rec. at 27:50–28:05.

met again for a status conference and to discuss their disagreements and proposed next steps. Minute Entry (03/24/2023). Among the topics discussed at that status conference were the applicability of the Federal Rules of Civil Procedure and whether the documents that Gaskins requests, if any, are discoverable.

## II.   DISCUSSION

The Court will lay out the legal standards applying to discovery in certificate of innocence proceedings and provide the parties guidance on moving forward with discovery in this case.

### A. Civil Discovery Rules Apply to This Case

As a threshold matter, the Court must address what standards govern discovery here. In Gaskins' procedural motion, he asked the Court to apply the "rules and legal theories applicable to civil discovery principles." Mot. for Disc. & for Evidentiary Hr'g at 3. The case that Gaskins cites for this proposition, *Pulungan v. United States*, 722 F.3d 983, 986 (7th Cir. 2013), does not specifically state that the traditional civil discovery rules apply to a certificate of innocence proceeding. At the March 24, 2023 status conference, the government stated that it did not believe that the civil discovery rules apply to this case. Status Conference Tr. (Draft) at 5:5–7. This is a novel issue, with no case resolving the matter.

The Federal Rules of Civil Procedure plainly control here because (1) the petition for a certificate of innocence is a civil proceeding and (2) the Federal Rules of Civil Procedure apply to all civil actions and proceedings unless Congress or the Supreme Court has made a specific exception, and no exception has been made for this type of proceeding. For the first point, this Court previously remarked, "[a] petition for a certificate of innocence is civil in nature" and that "[u]nlike in a criminal action, the party seeking the certificate bears the burden of proof and must prove his case by a preponderance of the evidence." *Gaskins II*, 2019 WL 7758898, at *1 (citing

3

*Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993) and *United States v. Grubbs*, 773 F.3d 726, 732–33 (6th Cir. 2014)); *see Abu-Shawish v. United States*, 898 F.3d 726, 736 (7th Cir. 2018) ("A petition [for a certificate of innocence] starts what is, in essence, a civil proceeding within the closed criminal case."). The Circuit indicated that it shares this view. *See Gaskins III*, 6 F.4th at 1354–55 ("A petition for a judicial certificate of innocence may be filed under the existing criminal docket number or as a separate, miscellaneous civil case" (internal quotation marks and citation omitted)); *id.* at 1361 (using the phrase "civil proceeding" to describe the nature of a proceeding "for a certificate of innocence"); *id.* at 1363 (favorably citing Seventh Circuit cases describing the applicability of civil procedure principles to proceedings for certificates of innocence). For the second point, Federal Rule of Civil Procedure 1 states that the federal rules "govern the procedure in *all* civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1 (emphasis added). Neither Congress nor the Supreme Court has established an exception to that basic rule for certificates of innocence. Consequently, the Federal Rules of Civil Procedure apply.

Next, discovery is governed by Federal Rules of Civil Procedure 26 through 37. *See Doe 1 v. George Washington Univ.*, 573 F. Supp. 3d 88, 97 (D.D.C. 2021). In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The Court "must limit the frequency or extent of discovery otherwise allowed" if the Court determines, among other things, that "the discovery sought is unreasonably cumulative or duplicative" or that

4

"the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

Though the Court concludes that the civil discovery rules apply to this case, the Court acknowledges that this is not a typical civil case. Usually, discovery is essential to build a record of evidence for a court to adjudicate an issue. However, a substantial record already exists here. Over the course of Gaskins' three-month trial, the government presented evidence in the form of "eight cooperating witnesses, more than 14,000 intercepted telephone conversations, visual and video surveillance and evidence seized during the execution of search warrants." *Gaskins I*, 690 F.3d at 571–72, 576. The defense presented evidence its own in the form of witnesses and recorded phone conversations. *Id.* at 575–76. In other words, the parties start with far from a blank slate. Therefore, more limited discovery is required to rule on Gaskins' motion than in a typical case.

**B. The Court Will Grant Limited Discovery**

According to the Circuit, "[Gaskins'] position all along—in the criminal case and in seeking a certificate of innocence—has been that he never joined a narcotics conspiracy, but worked as a 'gofer' for Frederick Miller, a since-convicted leader of the conspiracy, running personal errands for Miller and carrying out various administrative tasks for Dream Team Investigations (DTI), Miller's private investigations company." *Gaskins III*, 6 F.4th at 1356 (internal citations omitted). Thus, "[t]he key issue bearing on whether Gaskins is entitled to the certificate concerns his state of mind, that is, whether he agreed to work with co-conspirators with the specific intent to distribute drugs." *Id.* at 1354. The Court interprets this instruction to mean that all discovery should bear some reasonable relation to this question.

In his original motion, Gaskins asked for discovery limited to the following pieces of evidence: (1) an unredacted version of Federal Bureau of Investigation ("FBI") records from a search of the conspiracy's stash house (an apartment in Maryland) that he received in response to a 2014 Freedom of Information Act ("FOIA") request (including an interview with Miller, inventories of the apartment, and the results of a fingerprint analysis), *id.* at 3–4; (2) the lease application paperwork for the stash house, *id.* at 4–5; (3) bank records for DTI, *id.* at 5; (4) notes from interviews with government informants, *id.*; and (5) that he be permitted to extend document requests and interrogatories, *id.*

In the recent joint proposed scheduling order, Gaskins expanded upon his original discovery request by asking for the following: "1) All notes from witness interviews where the investigator or interviewee mentions Mr. Gaskins by name or implication . . . . If a transcript or recording of the interviews exist, those should be produced as well; 2) All reports/records from the searches of Mr. Gaskins' residence and the stash house; 3) All records referring or relating to Dream Team Investigations, including investigative notes, inventories, bank records, and notes from interviews; 4) Any documents from 2000-2004 that contain Mr. Gaskins' handwriting; and 5) Any documents the government intends to introduce at the hearing." Joint Proposed Scheduling Order at 3.

The government opposes all of Gaskins' discovery requests, both past and present, except for perhaps an unredacted version of the FBI records. *Id.* At the March 24, 2023 status conference, the government stated that, though it has not been in contact with the FBI FOIA office, it is possible that the office no longer has a copy of the unredacted records because such records are normally destroyed after six years in accordance with that office's retention policy. Status Conference Tr.

(Draft) at 3:18–22. The government further indicated that an original copy of the records may exist in one or several of the more than one hundred case files pertaining to this case. *Id.* at 3:25–4:3.

  i.  *The Unredacted Version of the FBI Records Is Discoverable*

The Circuit already indicated that it is necessary to review unredacted versions of documents obtained by Gaskins' FOIA request—and particularly the interview with Miller—prior to ruling on his certificate of innocence. *See Gaskins III*, 6 F.4th at 1364 ("[T]he unredacted summary [of the Miller interview], as a contemporaneous account, could be a source of valuable information, beyond any recollection of the interview that Miller might provide (assuming the document reflected an interview of Miller and not someone else)."). The Court agrees that an interview with Miller from the time of the raid on the stash house, where Miller purportedly mentions Gaskins, could be relevant in determining the truthfulness of Gaskins' assertion that he was unaware of DTI's illicit activities and simply followed Miller's commands without question.

The Court recognizes that locating these records may impose some burden on the government. However, the Court concludes that the importance of such information for the case and Gaskins' inability to access the information, among other factors, outweigh any burden to the government. That said, the Court understands that law enforcement documents must be treated with special sensitivity. Thus, the Court will order production of the FBI records directly to the Court for *in camera* review. *See Mobley v. CIA*, 924 F. Supp. 2d 24, 68 (D.D.C. 2013). If Gaskins and his counsel believe that *in camera* review would be insufficient, they should attempt to negotiate an appropriate protective order with the government so that they may review the document directly.

  ii.  *The DTI Bank Records Are Discoverable*

Similarly, the Court will grant Gaskins' request for production of the DTI bank records. Since trial, Gaskins has maintained that DTI was a private investigations firm, that he "did not

know about the existence of the drug conspiracy being operated [Miller] and others at DTI, did

not share in its proceeds, and [that he] performed only legal acts that he believed were in service

of DTI, a seemingly legitimate business venture with clients and staff[.]" Mot. for Certificate of

Innocence at 8, 10–11.

The existing record contains conflicting information regarding DTI's legitimacy. On the

one hand, "the government established at trial that DTI did not receive funds from the federal

district court nor the superior court," *Gaskins II*, 2019 WL 7758898, at *3, even though

approximately ninety percent of defendants qualify for court-appointed counsel and related

services, Gov't Opp'n at 16. However, the trial record did not establish "why payments from

federal or local courts were a necessary or expected incident to a legitimate private investigations

business" or from what legitimate sources, if any, DTI did receive funds. *Gaskins III*, 6 F.4th at

1358. On the other hand, the defense established that Miller held a valid private investigator's

license and that DTI maintained a valid business license and valid D.C. tax registration

certificate during the relevant period. *See Gaskins I*, 690 F.3d at 575. For his part, Gaskins

claims that his duties for DTI included managing the company's bank account, depositing

checks, preparing checks for Miller's signature, handling payroll, preparing tax returns, Miller

Aff., ECF No. 1237-3, ¶¶ 10–11, and "arrang[ing] for quick-turnaround flights for Miller's

cousin, Charles Brown," for DTI business.[2] *Gaskins III*, 6 F.4th at 1357. Finally, Gaskins

maintains that private parties hired DTI to serve process and conduct investigative services,

among other tasks. *See* Williams Aff., ECF No. 1237-2, ¶ 2; Clennon Aff., ECF No. 1237-4, ¶ 2.

While the government's trial evidence about DTI presented a possible negative inference

that the company was a façade for the conspiracy, in the Circuit's view, this evidence was

---

[2] Brown later "pleaded guilty to working as a cash courier" for the conspiracy. *Gaskins III*, 6 F.4th at 1357 (citing *Gaskins I*, 690 F.3d at 573–75, 579–80).

"hardly substantial." *Gaskins I*, 690 F.3d at 581. Given this gap in the trial evidence and

Gaskins' purported role managing various DTI finances, information from DTI's bank records is

necessary for the Court to determine the credibility of Gaskins' claim of DTI's legitimacy.

       *iii.*     *The Court Will Allow a Limited Number of Interrogatories and Document Requests*

Gaskins asks for "[a] limited set of document requests and interrogatories" to "provide

clarity on" the arguments he raises. Mot. for Disc. & for Evidentiary Hr'g at 5. The Circuit has

indicated that the record in this case is not quite complete. *See Gaskins III*, 6 F.4th at 1362. In this

proceeding, Gaskins bears the burden to demonstrate his innocence. *See id.* at 1358–59. Thus, the

Court sees no reason that Gaskins cannot be permitted to submit a limited set of interrogatories

and document requests. *See Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C.

Cir. 1991) ("[D]iscovery under the Federal Rules of Civil Procedure should be freely

permitted[.]"). Such interrogatories and document requests, to which the government may object,

must be submitted in accordance with Federal Rules of Civil Procedure 33 and 34. Gaskins is

reminded that he may not request information or documentation that is already present in the trial

record, as such information would be duplicative. *See In re Navy Chaplaincy*, 323 F. Supp. 3d 25,

54 (D.D.C. 2018).

       *iv.*     *The Rest of the Information Gaskins Requests Is Outside the Scope of Discovery*

The Court will not order the rest of the production Gaskins requests because such

information is either duplicative or irrelevant and thus outside the scope of discovery.

Gaskins requests the lease and application for the stash house to conduct handwriting and

fingerprint analyses. But, as the government stated at the oral argument on Gaskins' appeal of

this Court's previous order, these documents are already part of the trial record and therefore

discovery is not required. *See* Oral Arg. Rec. at 29:20–38. Moreover, the Circuit indicated on

direct appeal that any handwriting analysis would not bear on Gaskins' state of mind. *See*

*Gaskins I*, 690 F.3d at 578 ("[E]ven if the government had proven that the handwriting [on the lease] was Gaskins', that would still be insufficient to establish that he knowingly participated in the conspiracy with the specific intent to further its objective of distributing narcotics."). Of course, there the Circuit examined the trial evidence under the standard of whether "a reasonable jury could have found, beyond a reasonable doubt, that [Gaskins] knowingly entered into the Eiland/Miller conspiracy with the specific intent to further its objective of distributing narcotics." *Id.* at 577. "On a motion for a certificate of innocence," on the other hand, "the burden is on the claimant to prove his innocence by a preponderance of the evidence." *Gaskins III*, 6 F.4th at 1354. That said, the Court is confident that handwriting analysis would not help Gaskins meet his burden to establish innocence in this proceeding for the same reason that the Circuit stated that such evidence would have been unavailing on direct appeal.

Gaskins further requests records related to searches of the stash house and his home. Regarding Gaskins' request for stash-house records, the Circuit noted that there was "no evidence that he was ever present at or near" that site, including the fact that his fingerprints were not found there. *Gaskins I*, 690 F.3d at 574, 578. Furthermore, the Circuit described how the search of Gaskins' home "yielded neither drugs, nor records, nor any other evidence linking Gaskins to the conspiracy. Nor did it (or any other search) yield evidence that Gaskins had expensive jewelry, clothes, cars, or homes—as searches did uncover with respect to other conspirators." *Id.* at 574. The Circuit emphasized that "[t]he government's only evidence was that Gaskins lived in his mother's modest apartment." *Id.* In other words, the record already extensively details the absence of evidence linking Gaskins to the stash house or linking Gaskins' residence to the conspiracy. Gaskins is free to point to this lack of evidence in support of his demonstration of evidence. Therefore, any additional evidence would be duplicative.

10

Likewise, Gaskins' request for notes, transcripts, and/or recordings of investigators' conversations with informants or witnesses who mentioned Gaskins, to the extent that such information is not already present in the trial record, is duplicative or irrelevant. At trial, the government presented eight cooperating witnesses. *See id.* at 573. "All but one were facing life in prison if they did not obtain a downward sentencing departure in consideration for cooperating with the government." *Id.* Even with these incentives, "none testified about any connection between Gaskins and a narcotics conspiracy." *Id.* These witnesses, who "[a]ll were deeply involved in the drug trafficking conspiracy," were presumably the government's strongest witnesses in support of the charges against Gaskins. *Id.* Because even these witnesses' testimony did not establish that Gaskins participated in the conspiracy, notes from interviews with these witnesses or others would not aid in answering the question of what Gaskins knew or did not know about the conspiracy. *See Alexander v. FBI*, 192 F.R.D. 23, 25 (D.D.C. 2000) ("This court will not compel further testimony to allow plaintiff[] to continue to rehash old topics of discovery that have already been extensively covered."). Moreover, any marginal helpfulness the notes may provide to Gaskins' claim is significantly outweighed by, and not proportional to, the burden of production on the government to locate such notes amidst the more than one hundred boxes of case files. "In contrast to the thin relevance of the requested discovery," namely as potential evidence that more witnesses were not aware of Gaskins, "the burden it would impose on the [government] is substantial." *In re Ord. of Hulley Enters. Pursuant to 28 U.S.C. § 1782*, No. 17-mc-1466 (BAH), 2017 WL 3708028, at *5 (D.D.C. Aug. 18, 2017). For this reason, the Court will deny this discovery request as well.

11

## III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the government provide to the Court unredacted versions of the documents attached as exhibits to Gaskins' Motion for Discovery and Evidentiary Hearing [1257-1 and 1257-2] for *in camera* review. Specifically, those documents are: 1) records dated July 20, 2004 and labeled with the file number 166E-WF-226414 SUB 302; and 2) documents labeled 040615003 PO NB detailing the results of fingerprint examinations.

It is further **ORDERED** that the government provide to Gaskins bank records for Dream Team Investigations that are in the government's possession.

It is further **ORDERED** that Gaskins may submit interrogatories and document requests in accordance with Federal Rules of Civil Procedure 33 and 34 to the extent that such interrogatories and requests seek information not already present in the record.

The parties are **ORDERED** to meet and confer on a proposed discovery timeline and tentative date for an evidentiary hearing. The parties shall submit to the Court their proposed timeline and hearing date by May 5, 2023.

**IT IS SO ORDERED.**

SIGNED this ___12th___ day of April, 2023.

Royce C. Lamberth
United States District Judge

12