**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| UNITED STATES of America | ) |
| | ) |
| v. | )      Criminal Case No. 04-379 (RCL) |
| | ) |
| Alvin GASKINS, | ) |
| | ) |
| Defendant. | ) |

_____)

## MOTION FOR CERTIFICATE OF INNOCENCE

Mr. Gaskins, through counsel, hereby renews his motion for a certificate of innocence pursuant to 28 USC § 2513. That section reads:

(a)Any person suing under section 1495 of this title must allege and prove that:

(1)His conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted, or on new trial or rehearing he was found not guilty of such offense, as appears from the record or certificate of the court setting aside or reversing such conviction, or that he has been pardoned upon the stated ground of innocence and unjust conviction and

(2) He did not commit any of the acts charged or his acts, deeds, or omissions in connection with such charge constituted no offense against the United States, or any State, Territory or the District of Columbia, and he did not by misconduct or neglect cause or bring about his own prosecution.

(b) Proof of the requisite facts shall be by a certificate of the court or pardon wherein such facts are alleged to appear, and other evidence thereof shall not be received.

It is uncontested that Mr. Gaskins meets the requirements of subsection (1). Mr. Gaskins was charged with (1) conspiring to distribute and possess with intent to distribute heroin, cocaine, cocaine base, and PCP, in violation of 21 U.S.C. § 846; (2) conspiring to participate in a racketeer influenced corrupt organization (RICO), in violation of 18 U.S.C. § 1962(d); and (3)

using a communication facility to facilitate a drug trafficking offense, in violation of 21 U.S.C. §

843(b). 690 F.3d at 572. He was convicted of the first conspiracy count, and this conviction was

overturned by the Circuit. *U.S. v. Gaskins*, 690 F.3d 571 (D.C. Cir. 2012).

Each of those offenses have a *mens rea* of knowing or intentional. The record in this case

along with the evidence attached to this motion demonstrate that Mr. Gaskins did not know about

the conspiracy and therefore could not have chosen to join the conspiracy, knowingly

participated in the conspiracy nor intended to further its aims. For that reason, the actions he was

charged for constituted no offense against the United States. Mr. Gaskins is factually and legally

innocent of all of the crimes for which he was charged, and he respectfully requests that the court

issue the certificate of innocence.

**1. History**

This history will be greatly abridged due to the long history of this case. In 2006, after a

3-month trial alongside three other individuals, this court convicted Mr. Gaskins for narcotics

trafficking, and sentenced him to 22 years. In 2012, a unanimous panel of the D.C. Circuit

described the trial as follows:

> A jury convicted Gaskins of being a member of a conspiracy that
> was alleged to have consisted of more than twenty individuals and
> to have taken place over a period of five years. To describe the
> events of those years, the government proffered eight cooperating
> witnesses, more than 14,000 intercepted telephone conversations,
> visual and video surveillance, and evidence seized during the
> execution of search warrants.
>
> Not one piece of evidence put Gaskins together with drugs,
> or conversations about drugs, involved in the conspiracy. None of
> the cooperating witnesses, many of whom pled guilty to
> participating in the conspiracy, described Gaskins as having any
> knowledge of the conspirators' drug trafficking activities. None of
> the recorded telephone conversations in which Gaskins
> participated mentioned drugs or drug transactions, whether in clear
> or coded language. Nor did any of the conversations of any other
> conspirators mention drugs or drug transactions in connection with

Gaskins. No surveillance detected Gaskins engaging in drug transactions, in the presence of drugs, or engaging in any conspiratorial meetings. And despite the execution of multiple search warrants, including one at the apartment in which Gaskins lived, the government found no guns, drugs, or drug paraphernalia associated with Gaskins. Moreover, although there was substantial evidence of the wealth amassed by other conspirators, there was no such evidence regarding Gaskins. To the contrary, the only evidence was that he lived in a modest apartment with his mother.

*U.S. v. Gaskins*, 690 F.3d 569 (D.C. Cir. 2012).

The court issued an order reversing the judgment of conviction and directing the entry of a judgment of acquittal, on the grounds that a reasonable jury could not have found that Mr. Gaskins knowingly participated in the conspiracy with the intent to commit the offense of distributing narcotics. *Id*. at 576. In so doing, the court found, there was "no affirmative evidence that Gaskins knowingly joined the narcotics conspiracy or had the specific intent to further its aims." *Id*. at 576-77.

On June 29, 2017, Mr. Gaskins moved for a Certificate of Innocence pursuant to 28 U.S.C. § 2513. Dkt. 1237. This court denied the motion on December 13, 2019. On January 31, 2020, Mr. Gaskins timely filed a notice of appeal. On August 3, 2021, the D.C. Circuit reversed and remanded this case for further consideration, finding that Mr. Gaskins should have had the right to further discovery before a judgment was rendered on his Certificate. The court wrote:

On a motion for a certificate of innocence, the burden is on the claimant to prove his innocence by a preponderance of the evidence. Presented with an acquittal on the ground that the evidence failed as a matter of law to establish guilt beyond a reasonable doubt, the district court deciding the innocence question must at least apply the distinct burden allocation and standard of proof to the relevant evidence.

We hold that the district court erred by denying Gaskins' motion for a certificate of innocence without addressing his procedural motion. The key issue bearing on whether Gaskins is entitled to the certificate concerns his state of mind, that is,

> whether he agreed to work with co-conspirators with the specific intent to distribute drugs. The actions the trial evidence shows he took do not add up to the charged offenses unless he agreed to join the conspiracy. In the circumstances, the district court's *sub silentio* denial of Gaskins' unopposed request for an opportunity to augment the record was error. We accordingly vacate the denial of the certificate of innocence and remand for further proceedings.

*U.S. v. Gaskins*, 6 F.4th 1350, 1353-54.

On April 12, 2023, this court issued a case management order. Dkt. 1309. The court required the government to turn over notes from an FBI interview with Defendant Miller, as well as bank records from Dream Team Investigations (DTI), an investigative company owed by Defendant Miller where Mr. Gaskins was employed. *Id*. at 7, 8. The court denied Mr. Gaskins' other discovery requests, noting that "the record already extensively details the absence of evidence linking Gaskins to the stash house or linking Gaskins' residence to the conspiracy. Gaskins is free to point to this lack of evidence in support of his demonstration of evidence. Therefore, any additional evidence would be duplicative."

On January 2, 2024, this court held an evidentiary hearing where Mr. Gaskins responded to questions asked by Mr. Gaskins' counsel and the court. Dkt. 1316. The government was given the opportunity to cross examine Mr. Gaskins, but declined to do so. Mr. Gaskins filed a motion to compel compliance with a second set of discovery requests, Dkt. 1340, and that motion was denied, Dkt. 1342.

**2. The government has not identified any evidence in response to discovery requests**

In response to discovery requests, the Government stated that it demonstrated at trial that DTI was merely a front for illegal narcotics trafficking. When asked to identify and describe, with specificity, all evidence the government has that DTI was not a legitimate investigative company or was involved in the drug conspiracy, the government did not identify any piece of information, instead pointing to the "discovery" and "trial evidence" generally. *See* Dkt. 1340-1.

The government further asserted that the trial record established that Mr. Gaskins knowingly participated in the conspiracy, but declined to provide any evidence of the same or explain how that evidence demonstrated a connection between Mr. Gaskins and the conspiracy. *Id*.

The undersigned's firm has reviewed the entire trial record in this complicated case. There is ample evidence that other defendants were involved in drug trafficking. However we have found no evidence of any acts Mr. Gaskins took in furtherance of the conspiracy except to help arrange one flight for Mr. Brown, and for that act, the wiretaps and other evidence provide no evidence that Mr. Gaskins a) knew that a conspiracy existed or b) knew that this flight, for Mr. Miller's cousin, was in any way related to the conspiracy. Mr. Brown testified that he only spoke with Mr. Gaskins once, to clear up an issue with that plane ticket. Mr. Brown received a significant downward departure in his sentence, and had every incentive to "snitch" on Mr. Gaskins – especially given that Mr. Brown testified at length about his cousin, Mr. Miller. But he did not.

In previous submissions, the Government has written at length about the crimes of the conspiracy, and of the actions of other people, but has never explained why with all that evidence, not a single **identified** piece connects Mr. Gaskins to the conspiracy.

The government should be precluded from presenting specific evidence now, if it can now identify any. Discovery enables the parties to know before the trial begins what evidence may be presented. It's designed to prevent 'trial by ambush,' where one side doesn't learn of the other side's evidence or witnesses until the trial, when there's no time to obtain answering evidence.[1] In their previous submissions in this case, the government has gone on at great length

---

1 *See, e.g.,* How Courts Work, American Bar Association, available at:
https://www.americanbar.org/groups/public_education/resources/law_related_education_network/
how_courts_work/discovery/

about criminal activity of other people without presenting any evidence that Mr. Gaskins had knowledge of any of it, or that any of it was occurring in his presence. In order to remedy this, Mr. Gaskins' discovery requests targeted specifically at the knowledge elements. The government had ample opportunity during discovery to identify evidence, any evidence, even just a theory, to explain their position that Mr. Gaskins knew that Mr. Miller was involved in drug trafficking, that he intended to aid that trafficking, or joined the conspiracy. Failure to disclose information during discovery precludes its use to oppose a motion, unless the failure was justified or harmless. Fed. R. Civ P. 37 (c)(1).

**3. Mr. Gaskins' acts were not a crime**

**a. Every conspirator faced extreme consequences if they failed to identify Mr. Gaskins role in the conspiracy. None did.**

This court recalled that none of the eight cooperating witnesses testified about any connection between Gaskins and a narcotics conspiracy, and noted that these "were presumably the government's strongest witnesses in support of the charges against Gaskins." *Id*. at 11. It is unclear from the record how many persons the Government interviewed for this case, but it is at least scores and perhaps hundreds. If none of the eight strongest witnesses testified about any connection between Gaskins and a narcotics conspiracy, it should be assumed that none of the scores of other witnesses who made themselves available to testify in any of the companion cases could tie Mr. Gaskins to the conspiracy. There were no shortage of criminals willing to turn upon each other, many of whom were facing life sentences if they failed to cooperate. That none had any information tying Mr. Gaskins to any part of this massive conspiracy is not a mere footnote. It would be remarkable, incredible even, for the criminals involved in this case to be

willing to "snitch" on everyone in order to save themselves but still protect Mr. Gaskins if they in fact had any testimony which would connect Mr. Gaskins to the conspiricy.

**b. There is strong evidence that DTI was intended to be a legitimate investigative and security company, and to appear to one to Mr. Gaskins**

There is significant affirmative evidence that DTI was intended by Miller to be a lawful business. The ideas for DTI sheet, found at the stash-house, does not paint a picture of DTI as a drug trafficking operation. Rather, it shows DTI operating as a legitimate business. See Tr. Day 14 133:6-134:20. PDF 1946 (Exhibit 209-A). This sheet is an uncensored, contemporaneous window into Mr. Miller's internal thoughts, made for his own personal use.

The bank records, a summary of which is attached as Exhibit 5, show nothing unusual. There were no large transactions. The transactions occurred regularly but not particularly frequently. If DTI was a "front" then one would assume there would be large quantities of money flowing through the business, particularly given the size of the conspiracy. There is no evidence of that. In fact, there is no evidence of any drug transactions flowing throw DTI, nor any drug transactions taking place on DTI property.

Mr. Gaskins had the opportunity to address the court on December 11, 2023. Dkt. 1316. Mr. Gaskins testified about his work history before working at DTI. He worked as a dispatcher for USA Today for four years before losing that job due to having a stroke that left him paralyzed on his right side. *Id.*, 9:6-21. After that, he worked for four more years for McDaniel's Investments, which ran a beauty salon. He was a clerk for the school, helping students get registered for their licensing, working on the phone, etc. 11:1-23. Mr. Gaskins had known Mr. Miller when they were growing up, but they had stopped being friends after school. Mr. Gaskins had become friends with Mr. Miller's aunt in the meantime. Mr. Gaskins wanted to get a new

job, and Mr. Miller's aunt reintroduced Mr. Gaskins to Mr. Miller for the purpose of getting him a job at a company called Dream Team Investigations. 12:5-13:9.

### c. The business of Dream Team Investigations

Mr. Gaskins worked at the reception desk of Dream Team Investigations. The office was laid out as three rooms, with the reception in the middle and an office with a closed door to either side. 13:10-23. This means that Mr. Gaskins would not be in the room for meetings or phone calls from other DTI employees.

Mr. Gaskins' was qualified by his previous experience for his work at DTI. DTI was engaged in a few related businesses. It served papers on tenants, see Exhibit 3, Affidavit of Silvia Williams, and was retained by attorneys for investigative work, see Exhibit 4, Affidavit of Cary Clennon. It would do jail interviews, including at jails outside of D.C. Dkt. 1316, 13:24-14:10. DTI also worked as a security service for rappers around the country. 14:6-19.

Mr. Gaskins testified that his work at DTI included working reception (answering 10-15 calls a day on average), 15:13-16, going down to the jail to take affidavits, arranging for Mr Miller's travel, 14:2:19, taking checks to the bank, filing recordings, maintaining recording equipment, picking up paperwork from the court, etc. Mr. Gaskins also was also responsible for picking up Mr. Miller's kids in the morning, taking them to school, and then taking them from school and to boxing practice or an aunt's house. 14:17-15:10.

For this work, Mr Gaskins testified that he was paid about $4-$500/week. 18:20-23. The government provided payroll records show Mr. Gaskins was reviving take-home pay via check of $256.20/week. *See* Exhibit 2, Payroll Records. The other employees were receiving considerably more. *Id*.

There were three other employees at DTI: Gerald Eiland, Corey Moore and Timothy Thomas. 15:20-17:21. Mr. Gaskins was friendly with these people when he encountered them in the office, but did not associate with any DTI employees outside of work except for Mr. Miller. *Id*.

DTI was Mr. Miller's business. Mr. Miller set out his vision for DTI in his "brainstorming sheet" that was found during the search of the stash house. This sheet is a very valuable as evidence. It was found in the "stash house" surrounded by evidence of criminal activity. Therefore, there is no reason to believe that Mr. Miller was toning his vision down or otherwise avoiding listing criminal activities. Here was Miller's vision for DTI:

**Dream Team Investigations for the Defense**

1. Investigators specializing in finding witnesses in tough or violent neighborhoods.
2. Will provide protective escorts for attorneys and their staff to locate witnesses or investigate crime scenes in potentially hostile neighborhoods.
3. Will allow defense attorneys use of our various street connections for reliable defense information.
4. Will provide armed (very discrete) protective services or escorts for attorneys in Maryland and Virginia (any further licensing requirements)?
5. Criminal and civil investigations.
6. Will conduct public criminal trial record searching for attorneys and prisoners.
7. Process server eviction notices and witness landlord tenant.
8. Locate owners of unclaimed property.
9. Will provide private security for hip hop and rap entertainers.
10. Spousal cheating.
11. Electronic sweeping for telephone taps and bugs.
12. General consultation
13. Debt collections (can investigate company, also do business debts collections.)
14. Payment for investigators under Criminal Justice Act.
15. Joint ventures with other investigative firms, lawyers or corporations.
16. Actual innocence cases, entrapment cases (government framing, police or prosecutorial misconduct.)
17. Nationwide investigative arms and legs and other U.S. cities: New York, Baltimore, Miami, Kansas City, Columbus, Atlanta, et cetera.
18. Prestigious business address.
19. Business cards
20. Flyers
21. General marketing plan of business services. "Dream Team investigations."

22. Monthly newsletter, the Snitch Report (public trials nationwide.) Complaints about various issues. Street talk, crime capital, et cetera, to be developed.

23. Internet searches for prisoners.

24. 'You can find anybody' (unclaimed money) By Joe Culligan, private investigator.[2]

25. "Set up website."

Miller intended DTI to be a legitimate business. His business ideas showed a developed concept, a target market, and various means to accomplish that goal. To the extent that he had criminal intent for DTI, he kept that on a "need-to-know" basis.

There is substantial evidence before the court that DTI did in fact do many of the business ideas in the list. DTI served process for landlords. *See* Exhibit 3, Affidavit of Sylvia Williams. DTI performed investigative work for defense attorneys, enough that they were known among that community at that time in the DC metro area. *See* Exhibit 4, Affidavit of Cary Clennon, Esq. Mr. Clennon testified that he hired DTI for investigative services based on more than one positive recommendation from experienced criminal defense attorneys. He described his relationship with DTI was professional and normal, and that the services DTI provided as legitimate and legal. *Id*.[3] DTI got that "prestigious office space" (#18) at 600 Pennsylvania Ave, NW. Cite.

---

2 This is a reference to You Can Find Anybody! By Joseph Culligan, LPI, first published by Jodere Group on November 1, 2000. The book provides instructions on how individuals or investigators can access public records.
3 Last week, upon request from the undersigned, the Court's records division scanned Dkt. 194 and entered it in the PACER database. This is the court's order in response to Mr. Miller's motion for recusal, to which the court helpfully attached several documents. Until now, the undersigned was unaware of the controversy within.

In 2003, Mr. Clennon hired Mr. Miller and Mr. Moore as investigators for his client Brian Bostick, a defendant in *U.S. v. Edlin* (Crim No. 98-264-RCL) and *U.S. v. Gray* (Crim. No. 00-157-RCL). Mr. Bostick had apparently been obstructing justice through witness intimidation and other means, and therefore had been restricted from receiving social visitors. A few months after Mr. Miller and Moore was hired, someone forged a certificate on Mr. Clennon's letterhead purportedly requesting permission for Mr. Clennon to allow an "investigator," Stacy Langley, to visit his client for unmonitored visits. The government filed a motion to exclude Mr. Clennon's investigators: Mr. Miller and Mr. Moore because the government was concerned that due to their criminal histories they should not be allowed to communicate with Mr. Bostick, and Ms. Langly because she wrote on jail forms that she was visiting as a "friend" and had done so as well before she had been nominated as an investigator.

At trial, Detective Steven Hall, a witness for the Government, testified that in his experience and opinion and background, it would not be unusual for an office manager to make airline reservations. Trial Tr. Day 10 131:2-10. A few pages later, by happenstance, a further conversation was played between Miller and Bryant where they are talking about renting a Hummer H2 convertible and finding hotels suitable for rappers and stars. Tr. 133:6-135:5.

Similarly, Call 631, between Miller and Timothy Thomas, was summarized in court in the following colloquy between Detective Steven Hall and attorney for Mr. Miller:

> Q. Detective Hall, let me go over a few things about this call. And I'm going to sort of do a summary question on these. I believe there are references in here to a rapper, to Chas being at Dream tonight, a club named Neon, a group known as the Backyard Band, a radio show, and down here toward the end about a rapper needing exposure with a corporation behind him. Do you have any reason to believe that that is not conversations about shows and musicians but rather code for anything to do with drugs?
>
> A. No, I don't.
>
> Q. Okay. Now, sir, there is a reference in here to a Long & Foster Realtor, a store, listing prices and negotiating prices. Do you have any reason to believe that's not legitimately about realty as opposed to drugs?
>
> A. Again, I don't have any opinion on one way or together.
>
> Q. Okay. And, sir, there's references in here about an office location, the need to get more lawyers, to get Toby's name passed around, different things about Web design, et cetera. Do you have any reason to believe that that is a 0028 code as opposed to talk about Mr. Miller's investigation firm?

---

Mr. Clennon learned of the forgery and withdrew from the case. Transcript, Dkt. 194 at 76-88. This court granted the motion as to both investigators. *Id*. Upon review of the forged certificate, it was clear that the forged certificate was *not* based on Mr. Miller's legitimate certificate – that is, Mr. Miller's work was legitimate and he did not provide the certificate which was altered for the forgery. *Compare* Letter, Dkt. 194 at 40 (forged letter) with *id*. at 41 (authentic letter); *see also* Transcript, Dkt. 194 at 76-88. Although Messrs. Miller and Moore were removed as investigators in that case, according to the records it was not due to any misconduct as investigators on their part, but merely due to their criminal records. It remains true that Mr. Clennon testified that he hired Mr. Miller based on multiple referrals from experienced defense attorneys. *See* Exhibit 4, Affidavit of Cary Clennon. If Mr. Clennon, an esteemed member of this court, suspected foul play, he would so state, or refuse to cooperate with the affidavit.

A. No.

Q. And finally, sir, this reference to – about ex-offenders and a program with the Mayor's office. Are you familiar with that?

A. No, I'm not.

Q. Okay. But do you have any reason to believe that that's code as opposed to a legitimate program?

A. No.

Tr. Day 21 27:5-28:10

Calls 1082 and 1085, with Miller and unknown individuals, were long discussions about setting up virtual offices in Orlando, along with discussions about the music business in New York and Orlando. Tr. Day 21 28:20-33:4. Call 1433, between Miller and Thomas, was a "long and tedious" discussion about regular business matters. Call 1466 is a call between Miller and Mr. Gaskins, where Mr. Gaskins is paying business taxes. Tr. Day 21 34:3-23. Call 2171 shows Mr. Gaskins handling the transfer of money that Mr. Miller had borrowed from a loan company or credit union. All of this tends to show that DTI was engaged in substantial legitimate operations.

The government's evidence in this case included a tuition invoice from "School of Private Investigation, Professional Career Development Institute" for $789 addressed to Miller. Gov. Ex. 305, Tr. Day 19 54:13-55:15. It included a manual for the "VL-8000 Bug Detector." Gov. Ex. 519. This corresponds to #11 on Miller's DTI idea sheet ("Electronic Sweeping for telephone taps and bugs"). Miller and DTI itself held detective licenses, issued by the Metropolitan Police Department. Testimony of Detective Fern Francis. Tr. Day 21 9:18-15:5.

Additionally, there are the bank records for Dream Team Investigations. These records show steady business, with a regular volume of transactions in unremarkable amounts. See Exhibit 5, summary of bank records, Exhibit 1, bank records, Exhibit 2, Payroll records. These

12

amounts correspond with reasonable charges for the sorts of services DTI provided, and certainly do not indicate laundering of drug money.[4] An average person would not see any "red flags" in the transactions, so we can't assume Gaskins should have. Further evidence of the lawful nature of DTI's transactions can be found in the Government's silence about the money coming in and out of DTI's account. If experts at the FBI could not find any evidence of crimes in the financial operation of DTI with their experts, particularly when that evidence would have been very useful to buttress such a weak case, then we can conclude to a preponderance that said evidence does not exist.

Call 0486 provides a first-hand look into how Miller and Eiland handled the drug business and how they handled the investigations business. A small portion of the conversation was part of the Government's evidence, relating to the conspiracy. But most of the call was discussion of other matters; relevant to DTI, they discuss business loans and a big gang bust and how that would generate work for their investigations business. *See* Tr. Day 14 16:5-17:16. This shows that, to Miller and Eiland, DTI was intended to be legitimate. Elsewhere in the call, there are discussion of "large checks" clearing. Miller says "Man all my checks cleared, the one 14,000, the one 5,000, the one 30,000, all that shit's cleared." *See* Call 04856. It is not immediately evident the source of those funds, but the records indicate that it didn't go through Dream Team Investigations or anywhere near Mr. Gaskins. *See* Exhibit 5. In other words, the evidence shows that Mr. Miller generally kept DTI's legitimate operations separate from his trafficking operation.

Similar conclusions can be drawn from the numerous phone calls played at trial during the examination of Mr. Steven Hall, Tr. Day 21, 14:17-26:13. Call 3953 was a wiretap of Mr.

---

4 Perhaps Miller may have subsidized DTI's operations with money obtained through drug smuggling in dry months, although there is no evidence of that. Assuming that would be pure speculation, and if even true, it wouldn't change the analysis.

Gaskins, Miller and a third person discussing taking a statement for an investigation. Call 417 was a call from a prisoner to Miller asking to retain him as an investigator. Call 4490 was related to the previous. Call 4686 between Miller and Gaskins discusses phone bills and retrieving documents from a court. Call 10278 between Miller and (possibly) Thomas related to a potential investigation case in Delaware. Call 10229 was a call between Miller and Paulette Richardson about an investigation and real estate.

In conclusion, Mr. Gaskins previous work experience qualified him for the position of office manager at an investigation and security company. While at that job, he was paid a modest salary in exchange for doing normal office tasks, including answering phones, picking up paperwork, filing, and for transporting Mr. Miller's minor children to school and extracurricular events. Part of his job was making travel arrangements for DTI employees, who did in fact travel often for the security side of the business. There Once, Miller used Mr. Gaskins to help his cousin with a flight that was part of a drug transaction, but this call, just like the 14,000 other intercepted calls, would give an objective observer no reason to believe that Mr. Gaskins knew what the flights were for, nor anything that should have raised suspicions, let alone anything that would give rise to a duty for him to investigate.[5]

DTI may not have been a roaring success, but it remained busy, transacted a reasonable amount of business while Mr. Gaskins was employed there, it paid its taxes, it had possession of "the tools of the trade," it paid for training for employees, and obtained proper licensure for itself and Mr. Miller. It had an office space, phone lines, and clients, including multiple officers of this

---

5 There is nothing at all unusual about quick-turnaround flights in the business, legal or investigative world. If, for example, an investigator needed a signature on an affidavit, taking the morning flight out and the latest flight back on a day would be the most sensible way to do so. Furthermore, the flight was to and from Kansas City; which at least in the common understanding of Americans is far from an internationally-known trafficking hub.

court. At all times, at least while in the presence of Mr. Gaskins, it appeared that DTI followed the model that Mr. Miller set out in his ideas sheet, and that model was for a lawful business.

**d. Mr. Gaskins' lifestyle demonstrates that he did not agree to work with the conspirators with the specific intent to distribute drugs.**

As the Circuit emphasized, "the key issue bearing on whether Gaskins is entitled to the certificate concerns his state of mind, that is, whether he agreed to work with co-conspirators with the specific intent to distribute drugs. The actions the trial evidence shows he took do not add up to the charged offenses unless he agreed to join the conspiracy." Cite. There is no evidence that Mr. Gaskins had reason to believe, even in broad or fuzzy outlines, that Mr. Miller was involved in trafficking large quantities of drugs across state lines.

Mr. Gaskins' modest pay and lifestyle compared to his workload is both evidence that he didn't know about the conspiracy, and that he did not agree to join the conspiracy. Is it more likely than not that he would have demanded more money if he knew he would be participating in such a profitable and dangerous enterprise. That is, if he were the sort of person to get involved in gangster activities. But the evidence shows that he is not.

**e. Mr. Miller did not trust Mr. Gaskins to be involved in the conspiracy**

Throughout the trial, the jury was repeatedly shown the steps that the conspirators would take to avoid detection. According to Miller, Mr. Gaskins was not fit that world. When the FBI raided his house, Miller was present and voluntarily spoke to an officer. According to the FD-302a from the search, early in the interview, an FBI agent told Miller "it appears like 'Faggy Alvin' will get the blame for everything." Miller said "he doesn't fuck with the fags because they

will tell." He said he lets Alvin handle paperwork for the business, but that's it. See Exhibit 6, FD-302.[6] It is clear that "the business" refers to DTI.

In other words, Miller didn't trust homosexuals to be part of his conspiracy, because they are likely to turn them over to the police. This is the best explanation for why in the endless intercepted calls, stake-outs, searches and interviews with cooperating witnesses, nobody could implicate Mr. Gaskins or reported or were recorded talking about the conspiracy in Mr. Gaskins' presence. The persons implicated in this high-level trafficking conspiracy had long criminal records, and a violent past. Mr. Gaskins did not, and was not to be trusted around gangster work.

**4. Mr. Gaskins did not, by neglect or misconduct, bring about his own prosecution**

**a. The government declined to explain how Mr. Gaskins' prosecution was brought about, or provide any evidence that he caused it**

Mr. Gaskins submitted the following discovery requests:

REQUEST NO. 3: Please admit that the government is in possession of no evidence that Mr. Gaskins, through neglect or misconduct, brought about his own prosecution.

The government replied:

The Government does not admit that the government holds no evidence that Mr. Gaskins, through neglect or misconduct, brought about his own prosecution. On the contrary, the government's trial evidence, which is part of the public record, established that defendant was part of the charged conspiracy, and substantiated the scope and operations of that conspiracy.

This triggered the following request:

REQUEST NO. 3.1: If you contend that Mr. Gaskins brought about his own prosecution through misconduct or neglect, please state exactly which actions you believe Mr. Gaskins took

---

6 Because the exhibit was marked "sensitive," out of an abundance of caution, Exhibit 6 is truncated to only include the pages related to Mr. Gaskins.

that constituted misconduct or neglect, the approximate date of said actions, and specifically how

those actions brought about his prosecution. If you do not make this contention, please so state.

The government replied, in relevant part:

> [T]he government's trial evidence, which is part of the public record, established that the defendant was part of the charged conspiracy, and substantiated the scope and operations of that conspiracy.

Dkt. 1340-1.

Surely Congress did not intend for a movant under 28 U.S.C. § 2513 to speculate as to

what brought about his or her prosecution, and then show that whatever that thing amounted to

misconduct or neglect. The government did not testify at trial as to why they chose to target Mr.

Gaskins. Neither Mr. Gaskins nor the undersigned was privy to internal conversations at the FBI

or DOJ in the course of their investigations. Rather, this provision exists to close a potential

loophole in the law. The law might otherwise allow a person who was prosecuted on the basis of

their own false or misleading statements to unjustly recover. Or, for example, a person who

intentionally or through neglect withheld evidence of alibi.

**b. This circuit should adopt the Seventh Circuit standard for determining if a litigant brought about their own prosecution**

There is currently a Circuit split as to the meaning of if a person might have been said to have

have "brought about" their own prosecution. The Seventh Circuit held as follows:

> The statute expressly requires a causal connection between the petitioner's conduct and his prosecution; it does not preclude relief simply because the petitioner engaged in misconduct or neglect, period. In a moral sense, perhaps, a person who engages in conduct that a prosecutor or trial court mistakenly believes to constitute a criminal offense might be said to have "brought

about" his own prosecution, on the theory that he would not have been charged had he comported himself in a more upstanding fashion. Yet, construing the statute in that way would require courts to assess the virtue of a petitioner's behavior even when it does not amount to a criminal offense. We decline to interpret section 2513(a)(2) in that fashion. Instead, **we conclude that before the petitioner can be said to have caused or brought about his prosecution within the meaning of section 2513(a)(2), he must have acted or failed to act in such a way as to mislead the authorities into thinking he had committed an offense**. …    In [circumstances where a certificate should be denied], a defendant has it within his means to avoid prosecution but elects not to do so, instead acting in such a way as to ensure it. In that sense, he is responsible for his own prosecution and deserves no compensation for his incarceration. The relevant conduct need not always be intentional – thus the statute's reference to "neglect" as well as "misconduct." Nonetheless, there must be either an affirmative act or an omission by the petitioner that misleads the authorities as to his culpability.

*Betts v. U.S.*, 10 F.3d 1278, 1285 (7th Cir. 1993).

The Third and Fourth circuits do not have the same hesitation to ask the courts to independently judge the virtue of a petitioner behavior. "Analyzing this third prong therefore requires an assessment of the 'virtue of a petitioner's behavior' embracing both conduct 'originally [ ] charged as crimes' and 'noncriminal conduct.'" *U.S. v. Moon*, 31 F.4th 259 (4th Cir. 2022), 267, *accord U.S. v. Johnson*, 114 F.4th 148, 157 (3rd Cir. 2024) The D.C. Circuit noted this dispute, but did not comment upon it. *U.S v. Gaskins*, 6 F.4th at 1362.

Although Mr. Gaskins would clear either standard, and the court need not decide between the standards in order to rule on this case, the Seventh Circuit has the better side of the argument. In *Johnson*, the Circuit adopts a law review article's thesis that the Supreme Court created a new canon of construction that "causation" in federal statutes refers to but-for cause, not proximate cause. 114 F.4th at 155-56. The article itself notes that such an interpretation would be "its own new federal causation standard that is not consistent with any state's common law or even the Restatement of Torts." Sandra F. Sperino, *The Causation Canon*, 108 Iowa L. Rev. 703 (2023).

This is an extraordinary claim. If the Supreme Court were indeed doing such a thing, it would not be *sub silento*.

Such analysis is clearly in tension with principles of textual and originalist analysis. Words in statutes have the meaning they carried when the words were written – their "original public meaning" – not their definition at the time of interpretation. *See generally, e.g.*, Scalia, Antonin, Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws. Causation in American law has always required both but-for and proximate cause across tort and contract law. This is a fundamental principle, without which whole branches of the common law would collapse into chaos. While the Supreme Court has found contrary Congressional intent in the text of a few subsections of a few statutes based on specific features within those statues, the Court has not come close to making the broad pronouncements heralded by the *Johnson* court. Proximate cause is alive and well in American law.[7]

The *Johnson* court further admits that its interpretation could result in absurd, or in its terms, "unpalatable" results. 114 F.4th at 161-162. For example, if a person were pulled over for a minor traffic violation, and in the course of that stop the person was mistakenly identified as a bank robber, they were then prosecuted and later applied for a certificate of innocence, that person would be disqualified from a certificate because they would not have been arrested or prosecuted but for a wrongful or negligent act. This sounds far-fetched, but it is in fact listed as a reason that one court in the Fourth Circuit denied a certificate. *United States v. Moon*, 31 F.4th

---

[7] To be clear, "but-for" cause, by definition, includes all acts, no matter how remote, which lead to an outcome. This is in contrast to "proximate cause," which takes into account culpability, how substantial the factor was, and how remote the cause is. Compare *Proximate Cause*, Legal Information Institute Wex, available at https://www.law.cornell.edu/wex/proximate_cause, with *But-For Test*, Legal Information Institute Wex, available at https://www.law.cornell.edu/wex/but-for_test.

259, 67 (4th Cir. 2022). ("Moon's conduct was far from virtuous. Even putting to one side his unlawful possession of a firearm, two other acts of misconduct led to his prosecution: his violation of South Carolina traffic safety law and his possession of illegal drugs.")[8] Similarly, if a petitioner met a friend as a child because they were invited by a mutual friend to skip school, and they never met again, but 15 years later that former friend, remembering their petitioner's name, forged petitioner's signature on a false loan document, leading to the false conviction of petitioner for fraud, under the *Johnson* standard, the petitioner would be out of luck. But for their intent to commit truancy, – legal misconduct – they would never have been prosecuted. This example sounds absurd, but it's no more absurd than refusing to compensate a factually innocent person who lost years of their liberty because they once committed a minor misdemeanor or because they happened to commit a traffic violation at the wrong time.

Even taking seriously the argument that the Congressional lawyers who drafted 28 USC § 2513 might have meant "but-for" cause despite but-for causation not being enough in almost every other legal context, it is but one possible interpretation. If one interpretation causes absurd, arbitrary and unjust results, and the other does not, a wise jurist would assume that Congress intended the just and rational interpretation. Congress did not intend a constitutionally-questionable interpretation of its innocence statute that would allow capricious denials based on undisclosed standards. Under our Constitution and most deeply held traditions, courts are not given a freestanding license to judge the ethics or morals of those in front of it. Rather, courts judge legal misconduct and neglect. That is what courts do every day, and that's what Congress intended for them to continue doing.

_____

8 Under the Seventh circuit reasoning, Mr. Moon would have been denied a certificate anyway.

The problems don't stop there: If Congress intended to make it possible for any misconduct or neglect, no matter how slight to remove one's eligibility – as is the logical meaning of "but-for" causation – this is arguably an excessive fine in violation of the Eighth Amendment. In effect, a person could receive a $200,000 jaywalking fine, with extra formal steps but no meaningful distinction. It has potential due process problems as well, placing unlimited discretion in the hands of the court with no guiding principles of how to apply it.

The Seventh Circuit's interpretation is far more sensible. It aligns with the plain meaning of the statute. It does not place the court in the awkward and inappropriate role of judging the "virtue."[9] of conduct. It still allows courts the discretion to deny certificates to persons who are gaming the system or who are taking advantage of a situation they created through their own misconduct or breach of duty (neglect). By applying traditional proximate cause analysis only to actions which are a breach of legal duties, the Seventh Circuit avoids the constitutional implications of allowing a judge to determine eligibility for a privilege or immunity based on unlimited and unbounded discretion about what sorts of legal activity amounts to "misconduct or neglect." This could cause additional constitutional problems if a person were denied a certificate based on constitutionally-protected activity such as speech, association, or practicing a lawful trade.

Is it possible under the Seventh Circiut's ruling, a person who a District Court believes is undeserving might still be eligible for a certificate under unusual circumstances? Yes. But such a situation would be extremely rare, and that rare situation is no horrible injustice. Very, very few people would willingly trade years of their lives in federal prison for any amount of compensation, let alone such a meager amount, only available after a long, unsure and expensive

---

9 A religious person might argue that is God's role to judge virtue, it's a court's role to judge law.

legal process. Anyone who was otherwise-qualified under this statute and proved their actual innocence would not be in a better position than if the conviction never happened; they aren't getting something for free. They spent years suffering in prison when they should have, according to our law, been free. Anyone who is issued a certificate under this statute has already lost more than they could ever get back.

The court should not protect Congress from itself by imposing stricter standards than the statutory language requires on its face, particularly in a statute that is already such a high lift for claimants that the law has barely developed over the last century due to paucity of caselaw. The Seventh Circuit's standards are supported by the text, the history, and the intent of the statute, and provides a justiciable standard. The Third Circuit's standard has none of those virtues, and instead by its own terms would have judges independently decide what is a virtue based on, apparently, personal preference. It should be rejected.

**c. The evidence shows to a preponderance that Mr. Gaskins did not cause or bring about his own prosecution.**

The same dragnet that failed to catch any evidence that Mr. Gaskins knew about the conspiracy also failed to capture any evidence that he brought about his own prosecution, let alone that he did so through misconduct or neglect. Mr. Gaskins maintained his innocence throughout the entire ordeal.  The evidence shows that DTI was engaged in a lawful, licensed business. If there were any evidence whatsoever that DTI had acted like an illegitimate business in front of Mr. Gaskins, perhaps under the *Johnson* standard, one could argue that Mr. Gaskins should have, or could have known he was contributing to illegal activity. But the evidence is universally to the contrary.

From Mr. Gaskins' perspective, the only "red flag" that might have been apparent to him was that Mr. Miller had a criminal past. However, Mr. Gaskins believes in redemption. When the government sent cooperating witness Rashawn Briggs to gather evidence against Mr. Gaskins, Mr. Briggs testified as follows:

> Q. How long had you known Mr. Gaskins?
>
> A. Years. Long time.
>
> Q. How did you to Mr. Gaskins?
>
> A. I knew Mr. Gaskins from like the late 80s, early part of 90s.
>
> Q. How?
>
> …
>
> A: Well, we used to be around the same – you know, around the same neighborhood.
>
> Q. Tell us about the conversation you had with Mr. Gaskins?
>
> A. Well, I was in the halfway house, and Mr. Gaskins was telling me, you know, say he would help me get an apartment, help me get a job, you know, help me, you know, with the little things that I needed, you know, before I got out of the halfway house.
>
> Q. Was this help going to involve drugs?
>
> A. No. I mean as far as what I seen, you know, he took me places that he knew about, you know, that might benefit me.
>
> Q. Such as?
>
> A. He took me to apply for housing and stuff like that. He took me to go fill out like applications and stuff like that, you know, so that I could get me a job and stuff. He would come back to the halfway house and probably bring me some food or something, you know, stuff like that.

Trial Tr., Day 17.

Mr. Briggs was facing life imprisonment if he failed to satisfy the government with his testimony. Tr., 48:12-49:. **Mr. Briggs testified to Mr. Gaskins' state of mind at the trial as well**:

> Q. I would like to ask you. You said that when you were released from the halfway house that you contacted or Mr. Gaskins got in contact with you, is that correct?
>
> A. Yes. We had I think somehow.
>
> Q. And in that time period what he did with you was he helped you to try to find work, is that right?
>
> A. Yes.
>
> Q. He assisted you in doing some things like getting a Social Security card, is that right?
>
> A. Yes.
>
> Q. Was this the same time period that Mr. Gaskins had a stroke ?
>
> A. Oh, I can't recall. I knew -- I heard that he had, but I don't recall if it was in between that time. I know when I was talking to him and I was seeing him, you know, he was all right.
>
> Q. At this time period he was also trying to help you get housing, is that right?
>
> A. Yes.
>
> Q. And he had mentioned to you the fact that he had found 6 a real job, right? Working for an investigative service, right?
>
> A. Yes.
>
> Q. And he tried to get you on being an investigator, is that right?
>
> A. Yes.
>
> Q. And in doing so you subsequently learned from him that you could not get hired or could not get processed because the Public Defender Service had changed some regulations, is that right?
>
> A. I can't recall the reason why but I just know that after that, you know, he just started helping me look for jobs in other places.

Q. But he was trying to help you get yourself back into the community right?

A. Yes.

Q. So he was trying to help you find legitimate employment?

A. Yes.

Q. **And that is what he had indicated to you, that there was a legitimate job that he had and he was trying to get you on, is that right?**

A. Yes.

Tr., 59:11-61:3

According to Mr. Briggs, Mr. Gaskins was trying to help him get on the straight and narrow, with a legitimate job and real housing. If Mr. Gaskins believed DTI was a front for or related to drug dealing, it would make no sense for him to get Mr. Briggs a job there. Furthermore, Mr. Briggs testified that Mr. Gaskins himself believed he had a legitimate job, and was so confident that it was legitimate that he was sharing it with Mr. Briggs. *Id*. How could a fact-finder court now conclude that Mr. Gaskins knew or believed DTI was illegitimate?

### 5. Conclusion

The only connection between Mr. Gaskins and the drug trafficking ring is through DTI. The evidence shows well beyond a preponderance that Mr. Gaskins did not know or have reason to know that his job at DTI involved participation in a drug trafficking ring. This evidence includes the testimony of Government witness Rashawn Briggs, the testimony of Mr. Gaskins himself and Mr. Miller's affidavit. The other documentary evidence demonstrates that either Mr. Miller intended for DTI to be legitimate and a separate enterprise from his illegal activities, or at least that he put an awful lot of effort into making it appear that way to everyone who wasn't in

on the conspiracy. This evidence includes, *inter alia*, Miller's DTI ideas sheet, the affidavits of Mr. Clennon and Ms. Williams, and the various calls intercepted by the government.

Nobody was ever recorded talking to Mr. Gaskins about drug smuggling, despite massive resources being dedicated to recording and gathering evidence. Mr. Gaskins lived modestly with his mother, while the conspirators were gaining wealth. The cooperating witnesses were facing life sentences and had every incentive to bait Mr. Gaskins into participating or speaking about participating drug smuggling. None succeeded.

The court must determine, to a preponderance, if Mr. Gaskins joined the conspiracy with the specific intent to further its aims. The court must determine which of two possibilities is more likely. One possibility is that Mr. Gaskins was lying to Mr. Briggs about DTI AND by pure happenstance managed to avoid being present for any drug-related communications despite a massive dragnet AND was foolish enough to be willing to risk decades in prison without being compensated AND is so slick that he avoided implicating himself even during prolonged contact with cooperating witnesses AND never visited any of the conspiracy's haunts despite being involved AND Miller was lying both in his affidavit and when he told the FBI he doesn't trust homosexuals not to turn him over to the police. The other possibility is that Mr. Gaskins didn't know that Miller was involved in the trafficking conspiracy that Miller took great pains to conceal.

When one piles independent assumption upon independent assumption, as one must do to explain away the evidence, the probability decreases geometrically with each new assumption. Even if the court were to believe that each of the above statements were true 4 times out of 5, the odds of them each happening together is $(.8)^6$, or about 26 percent, which is far short of a preponderance. In reality, each of those statements is almost certainly false, bringing the odds

beyond a reasonable doubt. There is simply no reason for Mr. Gaskins to have lied to Mr. Briggs about the legitimacy of DTI given that he was trying to help Mr. Briggs exit his life of crime and dependance, nor any reason to believe that the dragnet that caught so many people would miss any evidence of his knowing participation, nor any reason to believe he would willingly and knowingly participate in a conspiracy without being paid.

The government has declined to state why it chose to prosecute Mr. Gaskins, so there is no way to identify why he was prosecuted, beyond guesswork. But whatever that reason is, it was not based on unlawful or even immoral conduct on his part. Mr. Gaskins didn't "take the fall" for anyone, harbor any fugitives, withhold any exculpatory information from prosecutors that he was later shown to have, or commit any crimes in the relevant time period, let alone crimes related to the conspiracy.

For the foregoing reasons, Mr. Gaskins respectfully requests that the court issue the certificate of innocence.

Respectfully submitted,

Counsel for Alvin Gaskins:

_____/s/_____
Daniel James Hornal
Talos Law
D.C. Bar No. 1005381
615 E Chestnut St.
Bellingham, WA 98225
(202) 709-9662
daniel@taloslaw.com